Docket No. 99047.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CECIL S. SUTHERLAND, Appellant.

*Opinion filed September 21, 2006.–Modified Upon Denial of Rehearing December 4, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Kilbride, and Garman concurred in the judgment and opinion.

Justices Karmeier and Burke took no part in the decision.

## OPINION

Following a jury trial in St. Clair County, defendant Cecil Sutherland was convicted of aggravated kidnaping (Ill. Rev. Stat. 1987, ch. 38, par. 10–2(a)(2)), aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12–14(b)(1)), and first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(a)(1)). The circuit court sentenced defendant to death. This appeal followed. 134 Ill. 2d R. 603.

For the reasons discussed below, we affirm defendant's convictions and death sentence and remand for additional sentencing.

BACKGROUND

On July 2, 1987, the body of 10-year-old Amy Schulz was discovered on a dirt road in rural Jefferson County. Amy had been strangled, her throat had been slit, and she had been sexually assaulted. Amy had been missing from her Kell, Illinois, home in neighboring Marion County since the prior evening.

In early October 1987, four months after Amy's murder, defendant (then 32 years old) left his Dix, Illinois, home in Jefferson County and drove to Montana. Later that month, federal authorities arrested defendant on charges unrelated to this case. Based in part on information provided by Montana authorities, on October 22, 1987, Jefferson County police officers secured a search warrant from a Jefferson County judge authorizing a search of defendant's person, vehicle, and possessions. At the time, defendant was in federal custody at the Missoula County jail in Missoula, Montana, and defendant's vehicle was being held by federal park rangers at Glacier National Park in Montana. Jefferson County police officers flew to Montana, where they executed the warrant, seizing defendant's vehicle and personal property. They also obtained samples of defendant's head, beard, chest and pubic hair. Jefferson County police officers also arranged for transfer of defendant's vehicle to Illinois. On October 28, 1987, Jefferson County police officers secured a second warrant authorizing a search of the vehicle, which police executed in Illinois.

Eight months later, in June 1988, defendant was indicted in Jefferson County for the aggravated kidnaping, aggravated criminal sexual assault, and first degree murder of Amy Schulz. Defendant filed a motion to suppress all evidence seized in Montana pursuant to the October 22, 1987, search warrant. The circuit court denied the motion to suppress.

Following a change of venue to Richland County, a jury convicted defendant of all charges and subsequently found him eligible for the death penalty. The circuit court sentenced defendant to death. On direct appeal to this court, we affirmed defendant's convictions and sentence. *People v. Sutherland*, 155 Ill. 2d 1 (1992). Defendant

filed a petition for a writ of *certiorari* to the United States Supreme Court, which was denied. *Sutherland v. Illinois*, 510 U.S. 858, 126 L. Ed. 2d 130, 114 S. Ct. 170 (1993).

Defendant thereafter filed a postconviction petition raising numerous claims. The trial court held an evidentiary hearing on certain claims, but ultimately dismissed the petition. On appeal to this court, we reversed defendant's convictions and sentence and remanded for a new trial, citing ineffectiveness of trial counsel and improper prosecutorial argument. *People v. Sutherland*, 194 Ill. 2d 289, 299-300 (2000).

On remand, venue was transferred to St. Clair County. Prior to trial, defendant filed several motions challenging the validity of the search warrants issued on October 22 and October 28, 1987, and requesting suppression of all evidence seized pursuant to the warrants. The trial court denied such motions.

In May 2004, defendant's retrial began. Briefly, the State offered evidence that gold fibers found on the victim's clothing were consistent with the carpeting and upholstery in defendant's vehicle, and that red fibers found in defendant's vehicle were consistent with the victim's clothing. The State also offered evidence that two pubic hairs found on the victim's buttocks were microscopically consistent with defendant's pubic hair and that the two hairs had the same mitochondrial DNA (mtDNA) as defendant.[1] The State further offered evidence that animal hairs found on the victim's clothing could have originated from defendant's dog and that tire impressions found at the crime scene could have been made by defendant's vehicle. Defendant countered with evidence that he argued demonstrated that Amy Schulz was murdered by William Willis, her step-grandfather and a convicted pedophile. Defendant also challenged the State's hair and fiber evidence and introduced evidence that, at the time of Amy's abduction, he was watching a movie with his brother.

---

[1]Although the expert testimony concerning the mtDNA evidence will be set forth later in this opinion, we note that mtDNA, which is identical for all persons in the same maternal line, is distinct from nuclear DNA, which is generally considered a unique identifier.

After five weeks of testimony, the jury returned a verdict of guilty on all charges. Defendant waived a sentencing hearing and, along with the State, presented the circuit court with an agreed recommended sentence of death. The circuit court, after finding defendant death eligible, accepted the recommendation and sentenced defendant to death. Defendant's appeal lies directly to this court. 134 Ill. 2d R. 603.

ANALYSIS

Defendant argues that the trial court erred by declining to hold an evidentiary hearing on his motions to suppress evidence recovered pursuant to the two search warrants issued in October 1987; failing to hold an evidentiary hearing on his motions challenging the affidavits that supported the two search warrants; allowing the State to introduce evidence recovered from defendant's vehicle after the State failed to produce the vehicle pursuant to defendant's discovery request; allowing the prior testimony of crime-scene technician Richard Caudell, who died before defendant's retrial, to be read to the jury; allowing the State to call Sherry Witzel, a member of defendant's prior defense team, as a rebuttal witness; and allowing the State to introduce certain DNA evidence. Defendant also argues that the State's evidence failed to establish his guilt beyond a reasonable doubt.

I. Motions to Suppress Evidence

Defendant argues that the trial court committed reversible error by declining to hold an evidentiary hearing on his motions to suppress evidence seized pursuant to the search warrants issued on October 22 and October 28, 1987. The State argues that the trial court did not abuse its discretion in denying defendant's request for an evidentiary hearing on his motions to suppress. According to the State, the doctrine of collateral estoppel barred defendant from relitigating issues raised and decided in his first trial and not thereafter challenged on appeal. See *People v. Enis*, 163 Ill. 2d 367 (1994).

When reviewing a motion to suppress evidence, "we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of

the defendant's legal challenge to the denial of his motion to suppress." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001), citing *In re G.O.*, 191 Ill. 37, 50 (2000). The applicability of the collateral estoppel doctrine, a purely legal question, is also subject to *de novo* review. See *People v. Daniels*, 187 Ill. 2d 301, 307, 320-21 (1999); *People v. Powell*, 349 Ill. App. 3d 906, 909 (2004).

In *People v. Enis*, 163 Ill. 2d 367 (1994), cited by the State, we considered whether the trial court erred when, on remand for a new trial, the court refused to reconsider its earlier denial of the defendant's motion to quash arrest and suppress evidence. We found no reversible error. We reasoned that the defendant could have challenged the denial of his suppression motion in his first appeal and that the defendant's failure to do so justified the trial court's refusal on remand to reconsider its earlier ruling. "Where a defendant's conviction has been reversed for trial error, and the cause is remanded for a new trial, the doctrine of collateral estoppel bars the relitigation of a pretrial ruling, such as a motion to suppress, unless the defendant offers additional evidence or there are other special circumstances." *Enis*, 163 Ill. 2d at 386. In *Enis*, no special circumstances existed that would have warranted relitigation of the defendant's pretrial motion. Thus, we held that the trial court did not err in its refusal to revisit its earlier rulings. *Enis*, 163 Ill. 2d at 387. Accord *People v. Gilliam*, 172 Ill. 2d 484, 505-06 (1996); *People v. Jones*, 219 Ill. 2d 1, 19-23 (2006).

Based on our review of the record in the present case, we conclude that the issues raised in defendant's suppression motions filed on remand were previously raised and litigated in defendant's first trial and that the doctrine of collateral estoppel bars relitigation of the trial court's earlier pretrial ruling. We also conclude that defendant has failed to identify special circumstances or additional evidence that would warrant relitigation. Accordingly, the trial court did not err in declining to hold an evidentiary hearing on defendant's suppression motions.

The record discloses that prior to defendant's first trial, defendant filed a motion to suppress evidence seized pursuant to the October 22, 1987, search warrant. That warrant, issued by a Jefferson County judge, authorized the seizure of certain evidence located in Montana, including defendant's vehicle, clothing and hair samples. The affidavit

furnished by Officer Michael Anthis in support of the search warrant states in relevant part as follows:

> "[Amy Schulz] was last seen alive at approximately 9:00 p.m. [on July 1, 1987] at 4th and Jefferson Streets in Kell, Illinois. *** At approximately 9:00 p.m. Schulz neighbor Kathy Simmons stated she saw Amy Schulz walk south on Jefferson St. *** About five minutes later Simmons saw a tan colored car with rust spots go south on Jefferson St., in the same direction Amy Schulz was walking. Amy Schulz was never seen alive again.
>
> On July 2, 1987, Amy Schulz['s] body was found alongside a rural road in Jefferson County ***. Amy had been sexually assaulted and murdered. *** A footprint was found on her body and nearby and the ground print was identified as coming from a Texas Steer brand boot sold by K-Mart stores.
>
> A tire print was found near Amy Schulz['s] body and a cast of that print was analyzed by the Illinois State Police Forensic Science Laboratory and revealed it to be a 'Falls Persuader' regular bias tire made by Cooper Tire Company. It was determined that this tire print belonged to the right side of the vehicle suspected of transporting Amy Schulz to the crime scene. Hairs were found on her body and the laboratory determined them to belong to a white male.
>
> That on October 10, 1987 a tan 1977 Plymouth Fury registered to Cecil S. Sutherland, a white male, was found abandoned in the Glacier National Park, Montana. Cecil S. Sutherland was arrested on 10-21-87 by the Federal authorities. Among his possessions were knives contained in a duffle bag and Texas Steer brand boots. His vehicle had a 'Falls Persuader' regular bias tire on the passenger front side of his vehicle.
>
> His mother, Joan Sutherland, confirmed that Cecil Sutherland was living in Kell, Illinois on July 1st and 2nd, 1987. His former employer *** located in Jefferson County Illinois confirmed that he worked on July 1, 1987 from 8:00 a.m. to 4:00 p.m. He did not work on July 2, 1987."

-6-

On October 24, 1987, Jefferson County police executed the warrant in Montana, seizing the vehicle, hair samples from defendant, and other items.

In defendant's suppression motion filed prior to his first trial, defendant raised several issues regarding the Montana search: (1) the search warrant complaint and supporting affidavit did not allege facts constituting probable cause; (2) the warrant, issued in Jefferson County, Illinois, had no legal validity outside of Illinois, the Jefferson County police had no authority to serve the warrant outside of Illinois, and no warrant or other process was sought or obtained from the State of Montana; (3) the Illinois officers did not advise defendant of his *Miranda* rights when they questioned defendant about the case and refused his request for an attorney; (4) the officers illegally executed the warrant by threat of force and against the defendant's will, taking head, beard and pubic hair samples from defendant; (5) the officers impounded defendant's vehicle and caused it to be transported back to Illinois and also seized defendant's clothing, boots and other personal belongings without defendant's knowledge or consent; and (6) the search was conducted without the knowledge of federal authorities, in whose custody was defendant at the time of the search.

In opposition to defendant's suppression motion, the State argued that defendant lacked standing to challenge the search of the vehicle because defendant had abandoned the vehicle and therefore had no legitimate expectation of privacy in the vehicle. The State further argued that because defendant was in federal custody, the State of Montana had no jurisdiction or interest in the case and that Illinois law should govern the admissibility of evidence seized pursuant to the warrant. In the alternative, the State argued that even if the warrant was invalid, the good-faith exception to the exclusionary rule rendered the evidence seized in Montana admissible at trial.

An evidentiary hearing was held on defendant's motion to suppress. The same judge who issued the October 22, 1987, warrant presided at the hearing. Defendant called David Brundage, a forensic scientist with the Illinois State Police. Brundage testified that the boot print found at the crime scene was made by a Texas Steer brand boot, sold only by K mart stores. Brundage also testified that he examined a plaster cast of a tire print from the crime scene and concluded that the tire track was made by a Cooper Tire brand tire.

Defendant also testified at the suppression hearing. According to defendant, around the first of October 1987, he left Illinois and drove to Montana in his 1977 Plymouth Fury, stopping only for gas. Defendant had no particular destination and ended up in Kalispell, Montana, in Glacier National Park. On October 10, 1987, after spending one night in the park, his car ran out of gas. Defendant locked his car and left it in the park. Defendant left a note in the car, which read:

> "Car out of gas. I'm broke. Took what I could with me and got a ride back to the south. Will not be back for car. Please call one or both of the numbers on the front or back of this tablit [*sic*], let them deside [*sic*] what to do with the car and what's left inside. Title to car is in glove box. Title has been signed over to my folks."

Defendant testified that he had no further use for the vehicle and that it belonged to his parents.

Defendant took a makeshift backpack containing clothes and other items and secured a ride south. A day or two later, he headed back north and spent at least a week and a half "living off the land" in the park. Defendant was subsequently arrested by federal agents and ultimately pleaded guilty to attempted murder of a federal officer.

Defendant further testified that in late October 1987, while he was in federal custody in the Missoula County, Montana, jail, Officers Anthis and Parker, from Jefferson County, Illinois, served defendant with an Illinois warrant. No federal or Montana state authorities were present at the time. According to defendant, after learning the purpose of the officers' visit, he requested a lawyer. Anthis and Parker refused the request and told defendant that if he did not voluntarily provide hair samples, they would call in other officers and remove the hair themselves. Defendant protested, but provided the samples. Defendant never gave consent for the removal of his personal belongings or for the transport of the vehicle to Illinois.

The State called Eric Morey and Officer Anthis. Morey testified that in 1987 he was a law enforcement ranger with the National Park Service. On the morning of October 10, 1987, he observed a vehicle in a remote area of Glacier National Park. Frost covered most of the vehicle, indicating to Morey that it had been left there overnight.

Through the driver side window, Morey observed a small spiral notebook, open on the seat, with a note that read: "Read page one and two. Then please due [*sic*] what I ask. Know [*sic*] have my car towed in. Thank you." The note was signed "Steve."[2] Morey gained entry to the car, which was locked, read pages one and two of the note, and located the vehicle title. Morey contacted defendant's mother and a brother, Michael Sutherland, who expressed no interest in the vehicle. Defendant's brother told Morey that the Sutherlands would assign the title to whoever wanted the vehicle. On October 11, Morey returned to the vehicle with another ranger. The vehicle was driven to the park district storage facility and secured. The contents were later inventoried. On October 24, 1987, the vehicle was turned over to Illinois officers.

Officer Anthis, with the Jefferson County sheriff's department in Mt. Vernon, Illinois, testified that on October 24, 1987, he flew to Montana with special agent Charles Parker of the Illinois State Police and David Brundage. Anthis verified that he executed the warrant on October 24, 1987, in Missoula County, Montana. Anthis identified the affidavit he provided in support of the warrant and testified that he made no material misrepresentations in the affidavit, the information he provided therein was correct to the best of his knowledge and belief, and he executed the warrant pursuant to the direction of the court that issued the warrant.

Anthis further testified that on October 23, 1987, in Kalispell, Montana, he met with the federal officer investigating the Montana case against defendant and explained the purpose of his visit. The following day, he and Parker flew to Missoula, Montana, where they contacted prison authorities and arranged to meet with defendant in an interview room at the county jail where defendant was in custody. No other officers were present at the interview and no written approval to conduct a search of defendant was obtained from any judicial authority in Montana.

According to Anthis, he and Parker explained to defendant that they were conducting an investigation in Illinois. Without being asked

---

[2]Defendant's full name is Cecil Steven Sutherland. The record indicates that friends and family called defendant by his middle name.

about his whereabouts on July 1, 1987, defendant volunteered his itinerary for that date. He declined to answer further questions, however, and requested an attorney. Anthis gave defendant a copy of the search warrant and collected hair samples from defendant's head, beard, chest and pubic area without protest. Defendant pulled the hairs himself and placed them in the envelopes Anthis provided. Anthis denied threatening to use force to obtain the hair samples. Anthis also testified that he and Parker looked over defendant's clothing and personal items held by authorities in Montana. Anthis recalled that defendant might have had among his possessions a pair of Texas Steer brand boots, but that the boots may have been a different style from the one that had left the print at the crime scene. That same day, Anthis and Parker obtained possession of defendant's vehicle from authorities in Glacier National Park. Anthis confirmed that the right front tire was a Cooper Tire brand Falls Persuader tire. Anthis did not obtain permission from defendant or his family to take the vehicle.

Following argument, the trial court denied defendant's motion to suppress. In its written order, the court made several findings: (1) the police officers involved acted in good faith in applying for the search warrant and in executing it; (2) defendant abandoned his vehicle in Montana and therefore had no right to privacy in his vehicle and no standing to object to a search of his vehicle; (3) the search warrant was supported by probable cause as evinced by the facts contained within the petition and affidavit, specifically by David Brundage's identification of a Texas Steer brand boot print and Falls Persuader tire-track impression made at the crime scene, and the fact that Montana authorities informed the Jefferson County sheriff's department that defendant had a Falls Persuader tire on his vehicle and Texas Steer brand boots in his possession in Montana; (4) defendant had no right to privacy in his boots, which had been inventoried by the jail and were being held in the jail; (5) the hair samples were obtained from defendant pursuant to a validly issued search warrant without further coercion, threats or force; and (6) the search warrant was valid in Montana because it was properly obtained and because defendant was in federal custody at the time it was served. In its oral ruling, the trial court also noted that even if the hair samples were not given voluntarily, "it wouldn't matter because the State would have gotten

the samples later on anyway" because the search of the vehicle was valid.

Although defendant challenged the trial court's denial of his suppression motion in his posttrial motion for a new trial, he did not raise the issue on direct appeal following his first trial. Defendant also did not argue in his postconviction petition that appellate counsel was ineffective for failing to raise the issue on direct appeal.

Following remand for a new trial, defendant filed three motions seeking to suppress the evidence seized pursuant to the October 22, 1987, warrant. Specifically, defendant filed a motion to quash arrest and suppress evidence, directed to the hair samples taken from defendant while he was in custody in Montana; a motion to suppress two pocket knives obtained from federal authorities in Montana; and a motion to suppress evidence obtained from defendant's vehicle as a result of the Montana search. Defendant also filed a separate motion to suppress evidence seized pursuant to the October 28, 1987, search warrant. That warrant, issued by the same Jefferson County judge that issued the October 22 warrant, authorized only a search of defendant's vehicle, which had already been transported to Jefferson County.

In response, the State argued that the issues raised in defendant's four new suppression motions were previously litigated at his first trial and not challenged on appeal, and that the doctrine of collateral estoppel barred relitigation. The new judge, to whom the case had been assigned on remand, agreed with the State and denied the four suppression motions. As stated earlier, we find no error in the trial court's application of the collateral estoppel doctrine under the circumstances present here.

In each of the three suppression motions challenging the Montana search that defendant filed on remand, he essentially renewed the arguments he had made in his prior suppression motion. That is, defendant argued that the search was without his consent; the Illinois police had no authority to act as law enforcement officers in Montana; an Illinois warrant is valid only within the State of Illinois; the Illinois police officers did not attempt to secure a search warrant from an appropriate federal magistrate or judge in Montana; and state search warrants have no force or effect on federal property. Each of these claims was litigated in the earlier suppression motion hearing.

-11-

The only issue not expressly litigated in the earlier hearing was defendant's claim, raised only in his motion to suppress evidence seized from the Montana vehicle search, that "[a] state search warrant authorizing a search on federal property, or in another state, from an objective standard, would put a police officer on notice that the warrant was invalid on its face." This ground for suppression of evidence was available to defendant at the time of his original suppression hearing. "To allow defendant on remand to raise additional grounds not originally presented to the trial court for suppression of evidence based on the same search and seizure would foster piecemeal appeals contrary to the promotion of judicial economy." *People v. Abata*, 165 Ill. App. 3d 184, 188 (1988); see also *People v. Page*, 155 Ill. 2d 232, 250 (1993) ("application of collateral estoppel in the suppression context advances many of the same policy goals that underlie the doctrine generally, such as the conservation of judicial resources and the avoidance of repetitive litigation").

Considerations of judicial economy aside, the trial court's earlier ruling that the police officers acted in good faith encompasses this new ground for suppression. Defendant's failure, however, to challenge on appeal the trial court's good-faith finding barred relitigation on remand. See *Enis*, 163 Ill. 2d at 386. Further, because defendant also failed to challenge the trial court's earlier ruling that defendant had abandoned his vehicle and therefore had no legitimate expectation of privacy in the vehicle, the issue of whether the officers were on notice that the warrant was facially invalid is moot. See *People v. Hoskins*, 101 Ill. 2d 209, 220 (1984) ("the protections against unreasonable searches and seizures do not extend to abandoned property, as the right of privacy in the property has been terminated").

With respect to defendant's suppression motion challenging the search of the vehicle in Illinois pursuant to the warrant issued on October 28, 1987, defendant argues that this was a "new and original motion" and thus not subject to the bar of collateral estoppel. Although a motion challenging the Illinois vehicle search was not filed prior to defendant's first trial, the success of defendant's new motion was necessarily dependent on defendant's capacity to challenge the search. As already noted, however, defendant did not appeal the trial

court's earlier ruling that defendant, having abandoned the vehicle, had no legitimate expectation of privacy in it. Accordingly, the trial court, on remand, did not err in declining to entertain this motion.

Defendant next claims that special circumstances exist which warrant relitigation of his motion to suppress. See *Enis*, 163 Ill. 2d at 386. Defendant directs our attention to this court's opinion on postconviction review in which we held that defendant's original trial counsel was ineffective in failing to investigate and present certain boot and tire evidence and defendant was entitled to a new trial. See *Sutherland*, 194 Ill. 2d 298-99. Defendant argues that this court's holding that counsel's representation at trial was ineffective rendered counsel's representation prior to trial suspect and negated any application of collateral estoppel on remand. According to defendant, this court's decision ordering a new trial should have alerted the trial judge on remand to permit defendant to renew his motions to suppress. Defendant further argues that a "new revelation" exists, namely, trial counsel's incompetence at the suppression motion hearing, which deprived him of a full and fair hearing. See *Enis*, 163 Ill. 2d at 387.

This court has recognized an exception to the bar of collateral estoppel where "special" or "exceptional" circumstances exist. *Enis*, 163 Ill. 2d at 386; *Gilliam*, 172 Ill. 2d at 506. Special circumstances have been found where a defendant is acquitted and thereby denied the opportunity to appeal the trial court's ruling. In such a case, collateral estoppel will not bar relitigation of the trial court's ruling in a subsequent proceeding. *People v. Mordican*, 64 Ill. 2d 257, 261 (1976). Similarly, where the evidence a defendant unsuccessfully sought to suppress in his first trial was not relied upon by the State, the defendant will not be precluded, on remand, from relitigating the trial court's ruling because the issue would have been considered moot in his first appeal. See *People v. Savory*, 105 Ill. App. 3d 1023, 1027-28 (1982); see also *People v. Smith*, 72 Ill. App. 3d 956, 962 (1979) (holding that defendant was not precluded from relitigating issues on remand concerning the validity of a search warrant where issues were presented to, but not decided by, the appellate court).

Here, defendant has identified no special circumstances that prevented him from seeking or obtaining review of the trial court's denial of his suppression motion on direct appeal from his first trial or

in his petition for postconviction relief. Nor has defendant identified any case law supporting his argument that trial counsel's ineffectiveness in failing to investigate and present certain evidence during his first trial "negates" the applicability of the collateral estoppel doctrine on remand.

Defendant's further claim that he did not receive a full and fair hearing on his suppression motion is unavailing. Generally, the doctrine of collateral estoppel will only be applied if the party to be estopped had a " 'full and fair opportunity to litigate the issue.' " *People v. Pawlaczyk*, 189 Ill. 2d 177, 189 (2000), quoting *Vroegh v. J&M Forklift*, 165 Ill. 2d 523, 532 (1995); see also *Enis*, 163 Ill. 2d at 387 ("[d]efendant does not suggest that he did not receive a full and fair hearing on his pretrial motions"). Here, defendant's claim that he did not receive a full and fair hearing is premised on the alleged incompetence of original trial counsel at the suppression hearing. This issue, however, could have been raised on direct appeal from defendant's first trial, but was not. See *Sutherland*, 155 Ill. 2d at 12-25. We note that defendant did claim, in his postconviction petition, that "[t]he defense lost the ill-planned motion [to suppress] due to the lack of appropriate defense witnesses and attorney skill." Defendant did not pursue this claim on appeal from the trial court's denial of postconviction relief. Issues that could have been raised on appeal, but were not, will be deemed forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005). Defendant cannot now avoid the effect of this forfeiture and, in turn, the bar of collateral estoppel, by recasting the issue of trial counsel's ineffectiveness at the suppression hearing as a "new revelation."

Defendant also argues that additional evidence exists which warrants relitigation of his motion to suppress. Where a defendant, on remand, points to "newly discovered evidence" that would have been pertinent to the trial court's ruling on the defendant's motion to suppress, relitigation of the motion may be warranted and the bar of collateral estoppel will not apply. *Gilliam*, 172 Ill. 2d at 506, citing *People v. Holland*, 56 Ill. 2d 318, 321 (1974). On remand in the trial court, defendant asserted that a "litany of new evidence" exists which warranted relitigation of his motion. The trial court did not find the new matter sufficient to overcome the bar of collateral estoppel. We now consider this evidence.

-14-

*Montana Law*

Defendant first asserts that the information that no Montana statute or case law gives validity to an Illinois search warrant was not provided to the Jefferson County judge when he was asked to sign the two search warrants in October 1987. Defendant explains that this information was first obtained from a Montana state judge in June 2002.

Information that no Montana law validates an out-of-state warrant would not have been pertinent to defendant's motion to suppress evidence seized pursuant to the warrant that was executed in Illinois. Although such information would have been pertinent to defendant's motion to suppress evidence seized in Montana, such information can hardly be considered "evidence" in the traditional sense of the word. See generally Black's Law Dictionary 595 (8th ed. 2004) (defining evidence as "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact").

Even if we considered Montana law "evidence," Montana law was available for research and review at the time of the original suppression hearing. Merely conducting such research at a later date does not transform the information thus gathered into new evidence. Although new legal precedent could provide a basis for relitigating a suppression motion (*Enis*, 163 Ill. 2d at 387), defendant does not cite any such precedent.

In a related vein, defendant asserts that Officer Anthis and Jefferson County prosecutors were aware, at the time application for the warrants was made, that an Illinois search warrant may not be valid in Montana. Defendant cites to testimony from Anthis' deposition, taken in March 2002. Anthis testified that "preliminary discussions" about the validity of the warrant in Montana "may have" taken place in Illinois. He also testified that, "in talking to the officials out in Montana, they didn't know if the local judge would allow it [the search] or if we would have to reapply in the State of Montana." Defendant also cites to testimony from the May 2002 deposition of Officer Parker, who accompanied Anthis to Montana. Parker states, "There was general conversation about whether the search warrant would be honored out there [in Montana]." Defendant asserts that this

-15-

information was not provided to the judge when he was asked to sign the two warrants.

Assuming, without deciding, that the officers' deposition testimony constitutes new evidence that was not available at the time of the suppression hearing, such evidence would not warrant relitigation of the suppression motion. Evidence that the officers harbored concerns about the validity of an Illinois warrant in Montana would not impact the issue of whether the warrant was supported by probable cause, or whether the warrant was, as a matter of law, valid in Montana.

### Kell Park Incident

Defendant cites testimony from defendant's second trial concerning an incident at Kell Park on June 19, 1988. On that date, a group of citizens held a public forum to give their reasons why they believed defendant, who had not yet been indicted, was not involved in Amy Schulz's abduction and murder. As the speakers tried to address the crowd, a few individuals blew air horns and shouted. Officers Anthis and Parker were present in the park but did nothing to prevent the "disturbance" so the speakers could be heard. According to defendant, "[t]he failure of Anthis and Parker to act reflects negatively on their impartiality in their investigation of [defendant]."

Assuming that Anthis and Parker had a duty to prevent the so-called disturbance at Kell Park, we disagree that their failure to act necessarily "reflects negatively" on their investigation of defendant. In any event, this new evidence is irrelevant to whether probable cause existed for the issuance of the search warrants eight months earlier.

### Uninvestigated Leads

Defendant cites evidence that Jefferson County police failed to pursue two leads that someone other than defendant murdered Amy Schulz. The first lead involved a report by three men who were in Kell on the evening of July 1, 1987. Approximately 10 minutes before Dennis Schulz, Amy's father, arrived in town looking for Amy, the witnesses saw a man driving a gray pickup truck pull a child up off the street and across his lap into the truck. The truck drove east out of Kell. Police created a composite drawing of the driver. Defendant

notes that Officer Anthis testified at his deposition that it would have been logical to pursue this lead, and that Officer Parker testified at his deposition that he was not aware of any reports indicating that the lead was pursued. The second lead involved a report to police in El Dorado, Illinois, that a man had confessed to killing Amy Schulz. According to defendant, although this information was passed on to Jefferson County police, no action was taken. Defendant argues that information regarding these leads was not given to the judge when he was asked to sign the two search warrants.

Assuming, *arguendo*, that the foregoing evidence constitutes new evidence that was not available at the first suppression hearing, defendant fails to explain in what way this evidence was pertinent to the trial court's ruling on the suppression motion.

*Defendant's Compliance With Search Warrant*

Defendant asserts that Officers Anthis and Parker provided later deposition and/or trial testimony that defendant provided hair samples pursuant to the apparent authority of the Illinois warrant, not voluntarily, and that defendant was not given *Miranda* warnings when Anthis and Parker interviewed defendant in Montana. Defendant states that this information was not provided to the judge at the suppression motion hearing. We disagree.

Defendant testified at the suppression hearing that officers advised him that because he was not under arrest they had no reason to read him his rights. Officer Anthis did not contradict defendant's testimony or imply that he or Parker had, in fact, given defendant *Miranda* warnings. Defendant also testified at the suppression hearing that he challenged the authority of the Illinois warrant and initially refused to allow Anthis and Parker to execute the warrant for the hair samples. According to defendant's testimony, he acquiesced in the search only after the officers threatened to use force. Officer Anthis gave a different account of these events, testifying at the suppression hearing that defendant did not question the validity of the warrant and was cooperative in providing the hair samples. The later testimony of Anthis and Parker to which defendant now cites does not contradict or add to the testimony that was presented at the suppression hearing

and thus does not provide a basis for relitigating the motion to suppress.

*Preparer of Warrant Documents*

Defendant asserts that Anthis and Parker testified during their depositions that they had not typed or dictated the warrant affidavits or the warrants themselves and had no idea who prepared these documents. Defendant concludes: "Thus, the author of these documents remains a mystery to this day."

The gist of the testimony from Anthis and Parker is that they could not recall, at the time of their depositions in 2002, who prepared the warrants and supporting documents for the searches conducted in 1987. Assuming that the identity of the individual or individuals who prepared the warrant documentation was somehow relevant to the issues raised at the suppression hearing, we conclude that the officers' failed memories on this point provide an insufficient basis to relitigate defendant's motion to suppress.

*Tire Identification*

Defendant cites deposition testimony from Anthis and Parker that they did not know who provided the information to them, prior to the drafting of the warrant affidavit, that the tire print at the crime scene was made by a Cooper Tire brand Falls Persuader tire. Defendant concludes that the source of this information also "remains a mystery to this day." Evidence that the officers could not recall, 15 years later, who provided the tire identification information incorporated into the warrant affidavit is not grounds to relitigate defendant's motion to suppress.

Defendant also argues that police misled the judge who issued the warrants about the tire print identification by failing to disclose in the warrant affidavit that Cooper Tire had already concluded that the tire print was not made by a Cooper Tire brand tire. Defendant cites two letters in the record dated September 25 and September 30, 1987, sent by Cooper Tire to David Brundage, the forensic scientist who analyzed the tire print. The letters state, respectively, that nothing in Cooper Tire's files "even looks close to this impression," and that the tire could be a "Goodyear Custom Super Cushion." Assuming,

*arguendo*, that the two letters were not available to the defense at the time of the first suppression hearing, we conclude that this new evidence was insufficient to warrant relitigation of defendant's motion to suppress.

David Brundage testified at the suppression hearing about the method he used to identify the brand and style of tire that left the print at the scene. After narrowing down the number of possible manufacturers to three or four, Brundage contacted numerous dealers, manufacturers and distributors for assistance. He admitted that not all the responses he received verified his own conclusion that the print could have been made by a Cooper Tire brand tire. Brundage also testified that he received a telephone call from the product services manager at Cooper Tire confirming that the print could have come from a Cooper Tire brand tire. According to Brundage, that telephone call was received prior to October 22, 1987. The two earlier letters defendant cites do not necessarily contradict Brundage's testimony. Thus, we find no error in the trial court declining to revisit this matter.

### Warrant Affidavit for the Illinois Vehicle Search

Defendant also contends that police used misleading information to obtain the October 28, 1987, warrant which authorized the search of defendant's vehicle after it had been transported to Illinois. Particularly, defendant asserts that police misled the judge who reviewed the warrant affidavit into thinking that defendant's boots could have left the print found at the crime scene despite the fact that police knew, on October 28, 1987, having inspected defendant's boots in Montana, that they could not have left the print. Defendant also asserts that police misled the judge into believing that defendant's vehicle was similar to the car seen by witness Cathy Simmons on the night Amy disappeared, despite the fact that, contrary to Simmons' description, defendant's vehicle did not have rust spots, and defendant's vehicle had a different taillight configuration. Defendant buttresses this claim by citing to a May 2002 interview with Simmons in which she reported, after viewing photographs of defendant's vehicle, and the artist's sketch of the taillight assembly of the car she saw on the night of July 1, 1987, that defendant's vehicle was not the car she saw that night in Kell.

We are not persuaded that information concerning the boots and vehicle identification constitutes newly discovered evidence. Assuming, however, that this evidence was unavailable at the time of the earlier suppression hearing, we nonetheless conclude that such evidence provides an insufficient basis to revisit defendant's suppression motion. Defendant's argument assumes that he had a legitimate expectation of privacy in the vehicle to which fourth amendment protection would apply. But as already noted, the trial court determined that defendant had abandoned the vehicle. " 'Abandoned property is not subject to Fourth Amendment protection.' " *People v. Pitman*, 211 Ill. 2d 502, 519 (2004), quoting *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000). Furthermore, because defendant did not seek review of this ruling in his direct appeal from his first trial or in his postconviction petition, defendant has forfeited review. See *Blair*, 215 Ill. 2d at 443-44. Accordingly, his present claim challenging the search of the vehicle in Illinois is rendered moot.

*False Information in Affidavit*

Defendant also argues that the search warrant affidavit contained numerous falsehoods and omitted statements which misled the judge into finding probable cause to issue both the October 22 and October 28 search warrants. Defendant suggests that if an affidavit with the correct information had been submitted, the judge would not have found probable cause.

We have reviewed the "corrected" version of the warrant affidavit submitted by defendant, and note that some of defendant's additions to the affidavit include information the police first obtained during their trip to Montana. For example, defendant has added language indicating that the Texas Steer brand boots, which were among defendant's possessions in Montana, "were a different style" and the "imprints did not match the boot imprint found at the crime scene." Defendant also added language stating that the "rear light configuration" on defendant's vehicle, which was first viewed in Montana, was "different from the rear lights observed by witness Simmons" on July 1, 1987. Thus, defendant's argument that the corrected version of the affidavit would not have supported a probable cause finding for the issuance of a search warrant can only apply to

-20-

the October 28 warrant obtained after police returned from Montana and not the earlier warrant. With this limitation, we consider defendant's argument.

The purported corrections that defendant has made to the affidavit do not necessarily involve evidence that was not available at the time of the earlier suppression hearing. Only "newly discovered evidence" will justify a departure from the collateral estoppel doctrine. *Gilliam*, 172 Ill. 2d at 506. This aside, we find defendant's present claim is moot. The warrant issued on October 28, 1987, authorized a search only of the vehicle, not defendant's person. As already noted, however, defendant's ability to challenge the search of the vehicle is dependent on whether he had a legitimate expectation of privacy in the vehicle at the time of the search. The trial court determined this issue adversely to defendant and defendant never sought review of that ruling.

In summation, we find that the issues raised in defendant's four motions to suppress that were filed on remand raised issues previously litigated in defendant's motion to suppress filed prior to his first trial; defendant failed to appeal the earlier denial of his motion to suppress; and defendant has failed to identify special circumstances or newly discovered evidence that would warrant relitigation of the trial court's earlier pretrial ruling. Thus, the trial court on remand did not err in applying the collateral estoppel doctrine and declining to hold an evidentiary hearing on defendant's suppression motions.

## II. Motions for *Franks* Hearing

In addition to the four suppression motions defendant filed on remand, he also filed a motion seeking an evidentiary hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), to challenge the two search warrants. Defendant alleged that Officer Anthis knowingly and intentionally, or with reckless disregard for the truth, made several false statements and omitted information from the warrant affidavit. Defendant also filed an amended motion for a *Franks* hearing, alleging that the judge who issued the search warrants was not neutral and detached, and that no officer could have reasonably believed that the October 22, 1987, search warrant was valid in Montana. The trial court, relying on its

earlier ruling denying defendant's four suppression motions, determined that a *Franks* hearing was not warranted. Defendant argues that the trial court erred, requiring reversal of his convictions or, in the alternative, a new trial.

The State responds that the issues raised in the *Franks* motions were already litigated at the original suppression motion hearing and defendant, therefore, is collaterally estopped from relitigating those issues. Alternatively, the State argues that the allegations in defendant's motions did not warrant a *Franks* hearing. Although we agree with the State that some overlap exists between the issues raised in defendant's earlier suppression motion and the issues raised in his *Franks* motions, the issues are not identical. We therefore decline the State's invitation to apply estoppel principles with a broad brush to the issues raised in defendant's *Franks* motions and will consider the issues on the merits.

In *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), the United States Supreme Court recognized a limited right to challenge the veracity of the affidavit supporting a search warrant. In order to overcome the presumption of validity that attaches to a warrant affidavit and obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56, 57 L. Ed. 2d at 672, 98 S. Ct. at 2676. A "substantial preliminary showing" is made where the defendant offers proof that is "somewhere between mere denials on the one hand and proof by a preponderance on the other." *People v. Lucente*, 116 Ill. 2d 133, 152 (1987). If, after the alleged untruths in the warrant affidavit are set aside, the remaining statements in the affidavit are sufficient to establish probable cause, no hearing is required. *Franks*, 438 U.S. at 171-72, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684. The principles underlying the *Franks* decision also apply where information, necessary to a determination of probable cause, is intentionally or recklessly omitted from the affidavit. *People v. Stewart*, 105 Ill. 2d 22, 43 (1984). In such cases, "[t]he defendant must show that the information omitted was material to the determination of probable cause and that it was omitted for the

-22-

purpose of misleading the magistrate." *Stewart*, 105 Ill. 2d at 44. Omitted information is "material" where it is of such a character that had it been included in the affidavit, it would have defeated probable cause. *People v. Hickey*, 178 Ill. 2d 256, 282 (1997).

Affidavits must be viewed in a "commonsense," not a "hypertechnical," manner. *People v. Thomas*, 62 Ill. 2d 375, 380 (1975), quoting *United States v. Ventresca*, 380 U.S. 102, 109, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746 (1965); accord *Hickey*, 178 Ill. 2d at 285. Our function as the reviewing court is not to substitute our judgment for that of the issuing magistrate but, rather, to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Stewart*, 105 Ill. 2d at 49, quoting *Massachusetts v. Upton*, 466 U.S. 727, 732-33, 80 L. Ed. 2d 721, 727, 104 S. Ct. 2085, 2088 (1984); accord *Hickey*, 178 Ill. 2d at 285. Probable cause for a search warrant exists where " 'given all the circumstances set forth in the affidavit *** there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Hickey*, 178 Ill. 2d at 285, quoting *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983). With these principles in mind, we consider defendant's claim that the trial court erred by denying him a *Franks* hearing.

Defendant argues, in line with his first motion for a *Franks* hearing, that Officer Anthis made several misrepresentations in the warrant affidavit. The first alleged misrepresentation involves the tire print found at the crime scene. Defendant asserts that the police investigation revealed that the tire print at the scene could have been made by a Falls Persuader *or* Dean Polaris tire, and that the affidavit should have listed both possibilities. Based on our review of the record, we agree that the warrant affidavit should have referenced both types of tires. Inclusion of this additional information in the affidavit would not, however, defeat probable cause. Analysis of the tire print disclosed two possible tires as the source. The tire on defendant's vehicle satisfied one of them.

Defendant next asserts that the location of the tire print was over 100 feet away from where the body was found and thus was not "near" the body as set forth in the affidavit. According to the crime-scene technician, automobile tire impressions were found within 17 feet of the body. Those impressions were traced backward–over 100

feet–toward the entrance to the oil lease road where the body was found. Although the plaster casts made by the crime-scene technician may have been made from tire impressions closer to the entrance of the oil lease road, those impressions were part of the same tracks found within 17 feet of the body. Accordingly, use of the word "near" in the affidavit was not false or misleading.

Defendant also asserts that, contrary to the affidavit, the tire print was never determined to be from the "right side" of the vehicle suspected of transporting Amy Schulz. According to David Brundage's trial testimony, the plaster casts indicated an alignment problem with the vehicle and, in his opinion, the print was made by a tire on the *front* of the car. The affidavit should have so stated. Nonetheless, this misstatement in the affidavit does not affect the trial court's finding of probable cause. Both descriptions were equally limiting. That is, whether the tire was on the "front" or "right side" of the vehicle, the location of the tire that left the print at the scene was limited to two of four possible locations on a vehicle. The subject tire on defendant's vehicle, which was on the right front, fit either description.

The next alleged misrepresentation concerns the boot print found at the crime scene. The affidavit states that the "print was identified as coming from a Texas Steer brand boot," and that "among defendant's possessions were *** Texas Steer brand boots." Defendant states that the affidavit was misleading because the Texas Steer brand boots he owned could not have made the print at the scene. Defendant is correct that the Texas Steer boots found among his possessions in Montana could not have left the print at the scene. When Anthis completed the warrant affidavit on October 22, 1987, however, this fact was not known to him. Only after Anthis went to Montana and compared defendant's boots with the boot print from the crime scene did he learn that defendant's boots could not have left the print.

Defendant also asserts that Officer Anthis should have faxed a photocopy of the boot print to authorities in Montana for comparison prior to seeking a search warrant. Defendant's assertion as to what he believes would have been the better police practice or investigative technique in this case does not provide a basis for a *Franks* hearing. A defendant is required to make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless

disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56, 57 L. Ed. 2d at 672, 98 S. Ct. at 2676. Anthis' statement in the affidavit regarding the boots was not false or misleading.

Defendant further argues that when Officer Anthis applied for the second search warrant on October 28, 1987, he should have stricken the reference to the Texas Steer boots. We agree that once Anthis inspected defendant's Texas Steer boots in Montana and determined that they could not have left the print at the scene, the reference to the boots should have been stricken from the warrant affidavit. Nonetheless, we decline to consider what effect this would have had on the existence of probable cause to issue the October 28 search warrant. Underlying defendant's argument is his assumption that he had a legitimate expectation of privacy in the vehicle at the time of the October 28, 1987, search. As noted earlier in this opinion, the trial court, prior to defendant's first trial, ruled that defendant abandoned the vehicle and therefore had no legitimate expectation of privacy. Defendant did not appeal that ruling. Accordingly, defendant's claim that the October 28 warrant was not supported by probable cause is moot.

Defendant also asserts that the October 22, 1987, warrant affidavit was misleading by improperly implying that a nexus existed between the tan vehicle seen by witness Cathy Simmons on July 1, 1987, and defendant's tan vehicle. Defendant notes that the affidavit omitted Simmons' description of the taillight configuration of the tan vehicle she saw on July 1, and that the taillight configuration on defendant's vehicle was not a match. According to defendant, police should have contacted Montana authorities to determine whether the taillight assembly on defendant's vehicle matched Simmons' description. We disagree with defendant that the foregoing assertions are sufficient to warrant a *Franks* hearing.

Officer Anthis testified at defendant's first trial that he did not put much faith in the description of the taillight configuration provided by Simmons, who was 16 years old at the time of Amy's murder. Anthis explained:

> "I had talked to the police artist that had done the diagram [of the taillight assembly based on Simmons' description]. He's done several of these and he is also trained in which to

observe the person he's getting the information from to see if they're trying to be too helpful and it was his personal feeling that the person was in such a high pressure situation they were trying to come up with things. And he even felt that possibly she was superimposing a tail light assembly from a Chevrolet Impala that her parents owned in order to help us because of the type of case it was."

Officer Anthis also testified at defendant's second trial that he was not confident in Simmons' description of the taillight assembly. *Franks* does not impose upon police a duty to include information in a warrant affidavit they reasonably conclude is unreliable. See *Stewart*, 105 Ill. 2d at 46-47. The fact that Officer Anthis included Simmons' description of the color of the vehicle does not make his omission of the taillight description suspect. According to Anthis, Simmons' description of the color of the vehicle was supported by other witnesses who reported seeing a vehicle of varying shades of tan or brown in the area the night of July 1, 1987.

Defendant also argues that upon their return from Montana, police intentionally failed to show Simmons photographs of defendant's vehicle because they knew Simmons would have told police that defendant's car was not the car she saw on July 1, 1987. Although defendant's argument is not entirely clear, we assume that defendant is arguing that police should have disclosed, when applying for the October 28, 1987, search warrant, that defendant's vehicle did not match the description provided by Simmons and that this disclosure would have defeated probable cause for that warrant. As we have already concluded, however, any claim that the October 28 warrant was not supported by probable cause is moot, in light of defendant's failure to appeal the trial court's earlier determination that defendant abandoned the vehicle and thus had no legitimate expectation of privacy in it.

The next alleged misrepresentation in the warrant affidavit concerns the following statement: "Hairs were found on the victim's body and the laboratory determined them to belong to a white male." Defendant contends that, according to the State's expert witnesses, sex cannot be determined from a hair, and the hairs found on the victim could only be classified as Caucasian, not Caucasian male. Defendant notes that the victim was also Caucasian and argues that

Officer Anthis deliberately misrepresented the evidence in his affidavit to exclude the possibility that the hairs could have come from a female, possibly from the victim herself.

We agree that no evidence was offered by the State that the hairs found on the victim were determined to have originated from a male and that Anthis' statement in the affidavit suggesting otherwise was incorrect. We disagree, however, with defendant's assertion that Anthis "deliberately" misrepresented the evidence. "[A] mere assertion does not give rise to an inference of improper conduct ***." *Stewart*, 105 Ill. 2d at 47. Moreover, the record discloses that, contrary to defendant's argument, the two pubic hairs found on the victim's buttocks could not have originated from the victim because the victim was prepubertal. In addition, the autopsy disclosed that the victim had been anally assaulted. Based on this evidence, coupled with the laboratory finding that the pubic hair came from a Caucasian individual, police could have reasonably concluded that the assailant was a "white male."

The final misrepresentation claimed by defendant relates to defendant's residence. The affidavit states that defendant's mother confirmed that defendant was living in Kell, Illinois, at the time of the murder. Defendant, in fact, lived in Dix, Illinois, in neighboring Jefferson County. Defendant argues that this fabrication was to mislead the judge reviewing the warrant affidavit by implying that Amy might know and accept a ride from defendant since both lived in the same small village. We agree that defendant's residence was misstated in the affidavit. Assuming, *arguendo*, that this misstatement was deliberate, the finding of probable cause would not have been adversely affected had the affidavit correctly reported defendant's residence in Dix. The proximity of the two communities would have placed defendant in the general vicinity of the murder on July 1, 1987.

We conclude, as to defendant's first *Franks* motion, that defendant failed to make the substantial preliminary showing required for a *Franks* hearing. That is, had the warrant affidavit correctly reported that the tire print found at the crime could have come from a Falls Persuader *or* Dean Polaris tire; the tire print was made by a tire on the *front* of the vehicle; the hairs found on the victim were from a Caucasian *individual*; and defendant lived in *Dix*, Illinois, the trial court's finding of probable cause would not be altered. In reaching

this conclusion we are aware that no single piece of evidence to which the affidavit referred was conclusive. Nonetheless, the affidavit, viewed in its entirety, supports the determination of probable cause. See *Stewart*, 105 Ill. 2d at 49.

Turning to defendant's amended motion for a *Franks* hearing, defendant asserted two additional grounds: the judge who issued the warrant was not detached and neutral, and the officers' reliance on the validity of the October 22, 1987, search warrant was objectively unreasonable. We find no error in the trial court's denial of a hearing on these matters.

As explained above, a *Franks* hearing is intended to allow a defendant a limited opportunity to challenge the truthfulness of the affidavit used by police to obtain a search warrant. *Hickey*, 178 Ill. 2d at 281. The new grounds defendant asserted in support of a *Franks* hearing do not challenge the truthfulness of the warrant affidavit. In addition, although the new grounds defendant asserts are cloaked in terms of the judge's neutrality and the officer's objective good faith, defendant's argument, at bottom, is that the October 22, 1987, warrant was invalid outside of Illinois. This issue, however, was already litigated at the suppression motion hearing prior to defendant's first trial. The trial court ruled that the warrant was valid in Montana. In addition, the trial court ruled that the police officers acted in good faith in their application and execution of the warrant. Defendant did not challenge these rulings in his direct appeal following his first trial or in his postconviction petition. Accordingly, the trial court on remand did not err in applying estoppel principles and declining to relitigate these issues.

### III. Inevitable Discovery/Abandonment

Before considering defendant's next error on appeal, we respond to certain statements by defense counsel regarding the two search warrants. Counsel forcefully argues that the Jefferson County judge had no authority to issue a warrant for a search in Montana and that he was acting merely as a "rubber stamp" for the Jefferson County police, or an "adjunct law enforcement officer." See *United States v. Leon*, 468 U.S. 897, 914, 82 L. Ed. 2d 677, 693, 104 S. Ct. 3405, 3416 (1984). Counsel makes an equally forceful argument concerning

the Illinois warrant, contending that the judge "signed the 'second' search warrant for the Sutherland car in an effort to correct or erase the invalidity of the first search warrant signed by him just six days earlier. This was a transparent attempt to hide the constitutional violations in serving an Illinois warrant in Montana." Counsel asserts that "[o]ver 200 years of legal jurisprudence will be wiped out with the stroke of a pen if the [judge's] two search warrants are deemed to be valid," and that defendant will be "denied his most basic of constitutional and human rights."

By rejecting defendant's arguments regarding his suppression motions and his motions for a *Franks* hearing, we do not hold that the two search warrants were "valid." Rejecting defendant's arguments also does not signal a departure from "200 years of legal jurisprudence." We acknowledge our concern that a circuit court judge in this state would issue a warrant purporting to authorize local police officers to execute a search in Montana. The authority of an Illinois judge clearly does not extend to Montana. See 48A C.J.S. *Judges* §71, at 658 (1981) ("a judge deriving his authority from the sovereign power of the state has no power to exercise his judicial functions outside the territorial limits of the state"); see also 68 Am Jur 2d *Searches & Seizures* §289, at 842 (2000) ("[o]fficers ordinarily may not execute a search warrant at a place which lies outside of their jurisdiction"); *People v. Lahr*, 147 Ill. 2d 379 (1992) (discussing territorial limitations of police officers). The question of whether to exclude evidence, however, is a separate question from whether the search is legal. *People v. Turnage*, 162 Ill. 2d 299, 307 (1994), citing *Leon*, 468 U.S. at 906, 82 L. Ed. 2d at 687-88, 104 S. Ct. at 3412. Accordingly, whether the Jefferson County judge and Jefferson County police exceeded the territorial limits of their offices, or whether the warrant affidavits were defective, is not dispositive of whether the evidence should have been excluded.

Under the exclusionary rule, on which defendant relies, "courts are precluded from admitting evidence that is gathered by government officers in violation of the fourth amendment." *People v. Lampitok*, 207 Ill. 2d 231, 241 (2003), citing *Mapp v. Ohio*, 367 U.S. 643, 649, 6 L. Ed. 2d 1081, 1086, 81 S. Ct. 1684, 1688 (1961). The exclusionary rule has no "constitutional footing" (*People v. Willis*, 215 Ill. 2d 517, 531 (2005)), and is not designed to redress the search

victim's invasion of privacy (*Lampitok*, 207 Ill. 2d at 241). Nor is it designed " 'to punish the errors of judges or magistrates.' " *Turnage*, 162 Ill. 2d at 307, quoting *Leon*, 468 U.S. at 916, 82 L. Ed. 2d at 694, 104 S. Ct. at 3417. Rather, it is a judicially created remedy that prospectively protects fourth amendment rights by deterring future police misconduct. *Willis*, 215 Ill. 2d at 531, citing *United States v. Calandra*, 414 U.S. 338, 348, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 620 (1974).

The exclusionary rule is not without its exceptions. Relevant here is the inevitable-discovery exception. This exception permits evidence, that would otherwise be inadmissable at trial, to be admitted where the State can show that such evidence "would inevitably have been discovered without reference to the police error or misconduct." *Nix v. Williams*, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511 (1984); accord *People v. Mitchell*, 189 Ill. 2d 312, 342 (2000). As the State notes, in the judge's oral ruling upholding the validity of the two search warrants, he alluded to the applicability of the inevitable-discovery exception. The judge indicated that even if defendant did not provide the hair samples voluntarily, "it wouldn't matter because the State would have gotten the samples later on anyway" because the search of the vehicle was valid. We understand the judge's remarks to mean that even if the seizure of defendant's hair was tainted, its lawful seizure was inevitable. We agree with the judge's assessment.

The record indicates that the vehicle search yielded hair and fiber evidence linking defendant to the crime. Specifically, 19 fibers were recovered from the front passenger seat and carpeting in defendant's vehicle which were consistent with the clothing Amy Schulz wore on July 1, 1987. In addition, numerous animal hairs found in defendant's vehicle were consistent with hairs found on Amy's clothing, all of which were consistent with hair from defendant's dog. Further, 28 gold fibers and one gold tuft found on Amy's clothing were consistent with the carpeting in defendant's vehicle, and one gold fiber found on Amy's clothing was consistent with the seat fabric in defendant's vehicle. Little doubt can exist that such evidence would have provided the probable cause necessary to support the issuance of a warrant for

a search of defendant's person and possessions.[3] A search of defendant's person, in turn, would have yielded the hair samples from defendant that were central to the State's case. If, as the trial court determined, defendant had no legitimate expectation of privacy in the vehicle, and thus could claim no fourth amendment protection, the seizure of defendant's hair was inevitable. Although defendant forfeited review of this issue by failing to raise it in his first appeal or in his postconviction petition, we choose to address the matter now and lay to rest defense counsel's claim that defendant was "denied his most basic of constitutional and human rights." See *People v. De La Paz*, 204 Ill. 2d 426, 432 (2003) ("[t]his court has long recognized that we may, in appropriate cases, reach issues notwithstanding their waiver"); *Hoskins*, 101 Ill. 2d at 219 ("party who waived the question is bound by his waiver, but the court, which has the responsibility of reaching a just decision, understandably is not").

In defendant's motions to suppress evidence seized from the search of his vehicle, defendant invoked the protections of both the fourth amendment to the United States Constitution (U.S. Const., amend. IV), as well as the comparable provision of the Illinois Constitution (see Ill. Const. 1970, art. I, §6). Defendant does not argue that our state constitution provides broader protection than the federal constitution in this situation. We therefore confine our analysis to fourth amendment jurisprudence. See *People v. Caballes*, No. 91547 (May 18, 2006); *Lampitok*, 207 Ill. 2d at 240-41.

Preliminarily, we note that although the State framed the issue as one of "standing" to challenge the vehicle search, this court, in line with United States Supreme Court precedent, has dispensed with the rubric of "standing" when analyzing fourth amendment claims.

---

[3]We need not decide what course of action Jefferson County police should have taken to effect a proper search in Montana. We need only note that, in determining whether probable cause for a search warrant exists, Montana courts, like this court, follow the totality-of-the-circumstances analysis set forth in *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983). See *State v. Meyer*, 323 Mont. 173, 179, 99 P.3d 185, 189 (2004); *State v. St. Marks*, 312 Mont. 468, 475, 59 P.3d 1113, 1118 (2002); *Hickey*, 178 Ill. 2d at 285.

*Pitman*, 211 Ill. 2d at 521, citing *Minnesota v. Carter*, 525 U.S. 83, 87-88, 142 L. Ed. 2d 373, 379, 119 S. Ct. 469, 472 (1998); *Rakas v. Illinois*, 439 U.S. 128, 138-40, 58 L. Ed. 2d 387, 398-99, 99 S. Ct. 421, 427-29 (1978). Instead, the relevant inquiry is whether the person claiming the protections of the fourth amendment had a legitimate expectation of privacy in the place searched. *Pitman*, 211 Ill. 2d at 514; *People v. Kidd*, 178 Ill. 2d 92, 135 (1997), citing *Rakas*, 439 U.S. at 143, 58 L. Ed. 2d at 401, 99 S. Ct. at 430. Factors relevant in determining whether a legitimate expectation of privacy exists include the individual's ownership or possessory interest in the property; prior use of the property; ability to control or exclude others' use of the property; and subjective expectation of privacy. *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986). When an individual abandons property, the right of privacy in the property is terminated. *Hoskins*, 101 Ill. 2d at 220; accord *Pitman*, 211 Ill. 2d at 519-20. Abandoned property may be seized and searched without probable cause. *Abel v. United States*, 362 U.S. 217, 241, 4 L. Ed. 2d 668, 688, 80 S. Ct. 683, 698 (1960); *Hoskins*, 101 Ill. 2d at 220; *People v. Jones*, 38 Ill. 2d 427, 432 (1967). Whether defendant had a legitimate expectation of privacy in the vehicle at the time Jefferson County police seized and searched it, or whether he had already abandoned the vehicle, as the trial court ruled, is based on the totality of the circumstances present in this case. See *Johnson*, 114 Ill. 2d at 192. We will pay particular attention, however, " 'to explicit denials of ownership and to any physical relinquishment of the property.' " *Pitman*, 211 Ill. 2d at 520, quoting *Basinski*, 226 F.3d at 837.

Defendant testified at the suppression hearing that he left Illinois around the first of October 1987 and drove to Montana. On October 10, 1987, after spending one night in Glacier National Park, his car ran out of gas. Defendant locked the vehicle and left the keys inside with a note that clearly stated, "Will not be back for car." Defendant signed the title over to his parents and left the telephone numbers of his parents and a brother. The note stated: "let them deside [*sic*] what to do with the car and what's left inside." Defendant testified that he had no further use for the vehicle; it belonged to his parents. During the 12-day period between the date defendant left the vehicle and his arrest by federal authorities, defendant did not return to the car. Based on this testimony, we agree with the trial court that defendant

abandoned his vehicle. See *Jones*, 38 Ill. 2d at 432 (holding that car was abandoned where driver jumped from vehicle and ran to avoid capture by police following store burglary); *People v. Arnett*, 217 Ill. App. 3d 626, 632 (1991) (holding that the defendant, "by leaving his car on a secluded gravel road, unlicensed, unregistered, and along the railroad tracks, had no expectation of privacy").

Defendant makes several arguments as to why the car should not be considered abandoned. Defendant first argues that the circumstances here do not come within the Illinois statutory definition of "abandoned vehicle." The statutory provision on which defendant relies, however, has been repealed. See Pub. Act 90–89, eff. January 1, 1998 (repealing 625 ILCS 5/4–100 (West 1996)). Defendant next argues that, pursuant to federal regulations governing the national park service, the park rangers failed to follow the procedures in place for the disposition of impounded property. See 36 C.F.R. §2.22 (1987). Whether the park rangers followed the appropriate procedures is irrelevant to whether defendant had a legitimate expectation of privacy in the vehicle.

Defendant further argues that he attempted to make a "gift" of the vehicle to his parents. According to defendant, he had the requisite donative intent, but the gift was not completed because acceptance and delivery did not occur. Defendant contends that because the gift was defeated, the ownership and privacy rights in the vehicle remained with him. In the alternative, defendant argues that even if the gift was accepted, "under Montana law the gift could be invalidated if there was undue influence, such as the circumstances of being broke, out of gas and unable to move his car." We assume defendant means to argue that if the gift was invalidated, the ownership and privacy rights remained with him.

Whether a legitimate expectation of privacy exists is not controlled by "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like." *Rakas*, 439 U.S. at 143, 58 L. Ed. 2d at 400-01, 99 S. Ct. at 430, citing *Jones v. United States*, 362 U.S. 257, 266, 4 L. Ed. 2d 697, 705, 80 S. Ct.725, 733-34 (1960). Similarly, whether defendant had a legitimate expectation of privacy in his vehicle is not controlled by fine distinctions developed under Montana gift law.

-33-

Finally, defendant argues that "when a person abandons property, forsaking all reasonable expectations of privacy, he abandons it to the whole world. He does not 'abandon' it to his parents." This argument is without merit. Abandonment, for fourth amendment purposes, may occur where control of a vehicle is transferred permanently to another person. See 1 W. LaFave, Search & Seizure §2.5(a), at 649-50 (4th ed. 2004).

We conclude that where, as here, an individual has left his vehicle unattended in a public place, transferred title to another person, expressed in writing his intention not to return for the vehicle, and later confirms that he had no further use for the vehicle, that vehicle has been abandoned. Fourth amendment protections do not extend to abandoned property. *Abel*, 362 U.S. at 241, 4 L. Ed. 2d at 687-88, 80 S. Ct. at 698; accord *Pittman*, 211 Ill. 2d at 519; *Hoskins*, 101 Ill. 2d at 220. Accordingly, an abandoned vehicle "may be seized by the police without a warrant and examined with no limitations on the scope, intensity, or objectives of the examination. It and its contents may be retained for use as evidence otherwise admissible against the one who abandoned it." *Duncan v. Maryland*, 281 Md. 247, 263, 378 A.2d 1108, 1118 (1977). The hair and fiber evidence recovered from the vehicle were admissible at trial against defendant. Moreover, the hair and fiber evidence recovered from the vehicle would have provided the probable cause necessary to secure a warrant authorizing a search of defendant's person in Montana, and the hair samples recovered from defendant would have been discovered inevitably through lawful means. Therefore, even if we accept defendant's argument that the search of his person in Montana ran afoul of his fourth amendment rights, the evidence seized was admissible at trial pursuant to the inevitable-discovery exception to the exclusionary rule.

## IV. Missing Vehicle

Defendant next argues that the State violated his due process rights, as well as this court's discovery rules, when it failed to produce the vehicle seized in Montana pursuant to defendant's discovery requests.

On March 14, 2001, prior to defendant's second trial, defendant filed a general discovery request seeking, *inter alia*, any tangible objects which were obtained from or belonged to defendant. Defendant followed that discovery request with a motion on May 21, 2001, expressly seeking production of the vehicle. At the hearing on this motion, the State indicated that although the evidence taken from the vehicle had been preserved and made available to defendant, the vehicle itself could not be located. Based on its investigation, the State surmised that the vehicle was transferred to the Jefferson County highway department in the early 1990s and that someone later disposed of the vehicle, probably after defendant's direct appeal, which was decided in 1992. The trial court directed the State to make available to the defense any information that may come to light concerning the location or disposal of the vehicle. The vehicle was never produced, and the State never learned the exact date and method of the car's disposal.

On May 17, 2002, defendant filed a motion to dismiss the indictments or, in the alternative, to "bar testimony about items taken from the car, tests done on those items, any results of tests or comparisons, along with any testimony about the car itself." Defendant argued that the State's failure to produce the car effected a violation of his federal due process rights under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), as well as a violation of Supreme Court Rule 412, governing disclosures to the accused (188 Ill. 2d R. 412). The State responded, in relevant part, that suppression of the evidence recovered from the vehicle was not warranted because what remained of the vehicle after processing by the State was simply a shell, and that the vehicle was not "outcome determinative." See *People v. Newberry*, 166 Ill. 2d 310 (1995). The State also responded that the evidentiary value of the remaining vehicle was merely "potentially useful" and, in the absence of bad faith, suppression was not warranted. See *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). The trial court agreed with the State and denied defendant's motion.

Defendant argues that the trial court erred in failing to dismiss the indictments or suppress the evidence seized from the vehicle and requests this court reverse his convictions outright or, alternatively, grant him a new trial. We review the trial court's ruling for an abuse

of discretion. See *People v. Hood*, 213 Ill. 2d 244, 256 (2004); *Newberry*, 166 Ill. 2d at 318; *People v. Walker*, 257 Ill. App. 3d 332, 336 (1993); *People v. Williams*, 137 Ill. App. 3d 736, 740 (1985).

*Due Process*

Defendant likens the loss or destruction of the vehicle in this case to the improper suppression of material evidence by the State under *Brady*. In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97; see also *United States v. Agurs*, 427 U.S. 97, 110-11, 49 L. Ed. 2d 342, 353-54, 96 S. Ct. 2392, 2400-01 (1976) (expanding *Brady* by recognizing a constitutional duty on the part of the State to disclose exculpatory evidence to the defendant, irrespective of whether the defendant makes a specific request).

This court has recognized that the *Brady* analysis is "ill-suited" in cases where, as here, the evidence has been lost or destroyed. *In re C.J.*, 166 Ill. 2d 264, 272 (1995), citing *People v. Hobley*, 159 Ill. 2d 272, 307 (1994). This court instead has applied the analysis in *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). See *C.J.*, 166 Ill. 2d at 273; *Hobley*, 159 Ill. 2d at 307; *People v. Ward*, 154 Ill. 2d 272, 298 (1992).

In *Youngblood*, the defendant was convicted of child molestation, sexual assault and kidnaping. The Arizona Court of Appeals reversed his conviction because the State had failed to refrigerate and thus preserve semen samples from the victim's body and clothing for later testing. *Youngblood*, 488 U.S. at 52, 102 L. Ed. 2d at 285, 109 S. Ct. at 334, citing *State v. Youngblood*, 153 Ariz. 50, 734 P.2d 592 (1986). The United States Supreme Court granted the State's *certiorari* petition "to consider the extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant." *Youngblood*, 488 U.S. at 52, 102 L. Ed. 2d at 285, 109 S. Ct. at 334. The Court noted that the due process clause, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant where the State

fails to disclose material exculpatory evidence, but that the due process clause requires a "different result" where the State fails to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. The reason for the different treatment rested in part on the Court's observation that " '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' " *Youngblood*, 488 U.S. at 57-58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337, quoting *California v. Trombetta*, 467 U.S. 479, 486, 81 L. Ed. 2d 413, 421, 104 S. Ct. 2528, 2533 (1984). The Court also noted its unwillingness to read the due process clause as imposing on police "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. The Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. The presence or absence of bad faith is dependent on the State's knowledge of the exculpatory value of the evidence at the time the evidence is lost or destroyed. *Youngblood*, 488 U.S. at 56 n.*, 102 L. Ed. 2d at 288 n.*, 109 S. Ct. at 336 n.*, citing *Trombetta*, 467 U.S. at 489, 81 L. Ed. 2d at 422, 104 S. Ct. at 2534. Under the facts of *Youngblood*, the Court found no due process violation. The Court characterized the failure of the police to refrigerate the clothing and to perform tests on the semen samples as negligent, at worst, and in the absence of bad faith, no violation of the due process clause occurred. *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289-90, 109 S. Ct. at 337-38.

In *Hobley*, this court commented on the underlying policy considerations present in the *Youngblood* case:

> "In order to promote the preservation of exculpatory evidence, there must be the possibility of a sanction where evidence is lost or destroyed. On the other hand, a defendant should not be rewarded for the inadvertent loss of a piece of evidence where other evidence sufficient to support his

conviction remains. The proper balance between these competing interests can be accomplished through careful consideration of (1) the degree of negligence or bad faith by the State in losing the evidence, and (2) the importance of the lost evidence relative to the evidence presented against the defendant at trial." *Hobley*, 159 Ill. 2d at 307.

Applying the principles set forth in *Youngblood* and *Hobley*, we conclude that defendant's claim is without merit. First, defendant failed to offer anything, other than mere speculation, demonstrating bad faith by the State. The record reveals that the vehicle was not introduced into evidence at the first trial in 1989, and that the State lost track of the vehicle during the ensuing years. The evidence recovered from the vehicle, including hair, fibers, carpet standards, fabric standards, the right front tire and wheel, and the entire front seat of the vehicle, were preserved. When faced with defendant's discovery request in 2001, Jefferson County police conducted a search for the car. The Jefferson County State's Attorney also pursued the matter with the Illinois State Police. Defendant suggests that the State showed "deliberate indifference" to finding the vehicle by refusing to report the vehicle as stolen in the National Criminal Information Center (NCIC) computer. The State explained during the hearing on defendant's motion that the NCIC guidelines do not permit a vehicle to be entered as stolen unless there is probable cause to believe that it is, in fact, stolen. The State's investigation suggested not that the car was stolen, but that sometime in the early 1990s an unidentified individual in the Jefferson County highway department, where the car had been transferred, took it upon himself to get rid of the vehicle. Based on the length of time involved, the State's preservation of the evidence recovered from the vehicle, and the State's efforts to determine the vehicle's whereabouts, we agree with the trial court that the State did not act in bad faith.

Second, we disagree with defendant's assessment of the evidentiary value of the vehicle relative to the other evidence introduced at trial. Defendant argues: "There is no single piece of evidence that is more pivotal, probative and material than the Sutherland vehicle. The State presented witness after witness as to the scrutiny of the car and the tests performed on items allegedly taken from the vehicle, and the conclusions to be drawn; but the Defense

was powerless to inspect the same crucial piece of evidence." Defendant's argument raises the same concerns we addressed in *People v. Newberry*, 166 Ill. 2d 310 (1995).

At issue in *Newberry* was whether the defendant, who was charged with unlawful possession of a controlled substance (cocaine), was entitled to have the charges dismissed where the State destroyed the substance in question after a specific discovery request. A field test of the substance conducted by police was negative for cocaine, but a laboratory test conducted one month later reached a positive result. The trial court granted defendant's motion to dismiss the indictments; the appellate court affirmed. *People v. Newberry*, 265 Ill. App. 3d 688 (1994). On appeal to this court, the State argued that under *Youngblood* the technician's destruction of the evidence did not rise to the level of a due process violation because the technician simply made a mistake and did not act in bad faith. We found *Youngblood* distinguishable on its facts and upheld the dismissal of the indictments:

> "In *Youngblood*, the disputed material was not essential for establishing the defendant's guilt or innocence. Its value was speculative, and it played no role in the prosecution's case. *** The situation in this case is markedly different. Here, the evidence in question is more than just 'potentially useful.' It is essential to and determinative of the outcome of the case. Newberry cannot be convicted of the drug possession charges absent proof of the content of the disputed substance, nor does he have any realistic hope of exonerating himself absent the opportunity to have it examined by his own experts." *Newberry*, 166 Ill. 2d at 315.

Putting aside, momentarily, whether the outcome-determinative analysis we adopted in *Newberry* supports defendant's position, we observe that the *Newberry* opinion has been called into question by the Supreme Court's decision in *Illinois v. Fisher*, 540 U.S. 544, 157 L. Ed. 2d 1060, 124 S. Ct. 1200 (2004) (*per curiam*). In *Fisher*, the Court reversed a decision of the Illinois Appellate Court which had applied the *Newberry* analysis to reverse a drug-possession conviction where the disputed substance was destroyed by police. The Court disagreed with the outcome-determinative analysis set forth in *Newberry*, indicating that the applicability of the bad-faith requirement in *Youngblood* does not depend on "the centrality of the contested

evidence to the prosecution's case or the defendant's defense." *Fisher*, 540 U.S. at 549, 157 L. Ed. 2d at 1067, 124 S. Ct. at 1203. The Court reiterated its holding in *Youngblood* that the bad-faith requirement applies where the evidence destroyed is only "potentially useful" evidence and not "material exculpatory" evidence. *Fisher*, 540 U.S. at 549, 157 L. Ed. 2d at 1067, 124 S. Ct. at 1203.

We find it unnecessary to decide whether the outcome-determinative analysis adopted in *Newberry* still has vitality in light of the *Fisher* opinion because, even if it does, *Newberry* is inapplicable under the facts present here.

In *Newberry*, the evidence destroyed by the State–the suspected cocaine–formed the very basis of the drug-possession charge against the defendant. Here, the evidence lost or destroyed by the State–the vehicle–did not form the basis of the kidnaping, sexual assault and murder charges against defendant. Nor was the vehicle, itself, central or critical to the State's case. The critical evidence was the hair, fibers, carpet standards, and fabric standards removed from the vehicle. This evidence, along with the suspect tire, wheel, and front seat of the car, were available to defendant for examination by his own experts. In addition, unlike the defendant in *Newberry*, who was deprived of any opportunity to examine the destroyed evidence, defendant had access to the vehicle during his first trial and for a time thereafter. Finally, unlike the *Newberry* case, where the disputed substance was destroyed following a specific discovery request, here the trial court found that the vehicle was lost or destroyed prior to defendant's discovery request. Although we agree with defendant that the State never determined the exact date and method of the vehicle's disposal, the trial court could reasonably conclude, based on the prosecutor's representations, that the vehicle was likely disposed of after it was transferred to the Jefferson County highway department in the early 1990s. Under *Newberry* or *Youngblood*, defendant's due process claim fails.

Before considering defendant's alternative argument, we note that defendant pressed only his federal due process rights in the trial court in connection with the missing auto, whereas before this court he asserts a violation of both his federal and state due process rights. Defendant's state law claim has been forfeited. See *Blair*, 215 Ill. 2d at 443-44. Even if we chose to address it, the analysis and result

would be no different than that set forth above. See *People v. Pecoraro*, 175 Ill. 2d 294, 318 (1997) (where this court, in a failure-to-preserve-evidence case, adhered to the "well-reasoned principles set forth in *Trombetta* and *Youngblood* for purposes of our state due process clause").

## Discovery Rules

Alternatively, defendant argues that, irrespective of any due process violation, dismissal of the indictments or suppression of the evidence recovered from the vehicle was warranted under this court's discovery rules. See 188 Ill. 2d R. 412(a)(v) (governing disclosures to the accused); 134 Ill. 2d R. 415(g)(i) (governing imposition of sanctions for discovery violations). Defendant relies on the *Newberry* opinion. In *Newberry*, as discussed above, we affirmed the dismissal of the defendant's indictments on due process grounds. We also noted, however, that dismissal of the indictment was sustainable as a proper discovery sanction under Rule 415(g)(i):

> "Rule 415(g)(i) confers broad power on the trial court to impose sanctions where, as here, the State fails to comply with its discovery obligations. Where evidence has been destroyed following a defense request under Rule 412 (134 Ill. 2d R. 412), no showing of bad faith by the State is required in order for the trial court to act." *Newberry*, 166 Ill. 2d at 317-18.

Based on the "pivotal nature" of the evidence destroyed in *Newberry*, we found no abuse of discretion in the trial court's dismissal of the indictments. *Newberry*, 166 Ill. 2d at 318.

Defendant's reliance on *Newberry* is misplaced. First, as noted above, the trial court in the present case found that the vehicle was lost or destroyed before defendant's discovery request, not following its receipt, as was the case in *Newberry*. Second, unlike the suspected cocaine which was "pivotal" to the State's drug-possession charge in *Newberry*, the vehicle here was not "pivotal" to the kidnaping, sexual assault, and murder charges against defendant. Accordingly, the trial court did not abuse its discretion in denying defendant's motion to dismiss the indictments as a sanction under Rule 415(g).

V. Sufficiency of the Evidence

Defendant next argues that the State failed to prove him guilty of aggravated kidnaping, aggravated criminal sexual assault, and first degree murder beyond a reasonable doubt.

When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, our function is not to retry the defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Rather, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In reviewing the evidence we will not substitute our judgment for that of the trier of fact. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. *Milka*, 211 Ill. 2d at 178; *People v. Evans*, 209 Ill. 2d 194, 211 (2004). A conviction may be sustained on circumstantial evidence, provided the elements of the crime have been proven beyond a reasonable doubt. *Milka*, 211 Ill. 2d at 178; *People v. Buss*, 187 Ill. 2d 144, 211 (1999). "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). With these principles in mind, we consider the evidentiary record in detail.

*The Victim*

In 1987, Amy Schulz, then 10 years old, lived with her father Dennis, brothers Adam and Ryan (then aged 14 and 12, respectively), and stepmother, Esther, in a mobile home located a half mile south of Kell, Illinois. Kell is situated in Marion County just north of County Line Road, which separates Marion County to the north and Jefferson County to the south. On July 1, 1987, the date of Amy's disappearance and murder, Amy spent the day with her father and

Ryan at her father's vacuum cleaner business in Salem. According to Dennis Schulz, they returned home at 6 p.m. or 6:30 p.m. Amy changed her clothes, putting on a pair of red, homemade shorts, a red shirt, white socks, and white tennis shoes. Amy sauteed some mushrooms for herself and went to visit Gwen and William Willis, her "step-grandparents."[4] The Willises lived 100 yards north of the Schulzes across a field. Gwen Willis testified that she and Amy ate blackberries in the backyard, after which Amy returned home.

Later that evening, Dennis Schulz gave Amy a flashlight and sent her into town to tell Ryan that Biscuit, one of the family dogs that was missing earlier, had been found. Because Jefferson Street is the only road that leads from the Schulz home into Kell, Dennis expected that Ryan and Amy would meet up at some point. Amy stopped at the Willis home around 8:30 p.m., stayed a short time, and then left, walking north on Jefferson Street toward Kell. Ryan never saw Amy, and Amy never returned home. Amy was last seen by neighbors Cathy Simmons and Paul Sherwin, who saw Amy walking south on Jefferson Street at about 9:10 p.m. and 9:15 p.m., respectively. The following morning an oil-field worker discovered Amy's body on a dirt oil lease road in rural Jefferson County.

### *Vehicle Sightings*

Cathy Simmons, who was 16 years old at the time of Amy's murder, lived in Kell and knew the Schulz family. She testified that on the evening of July 1, 1987, she and her sister Cheri took a walk and saw Amy. Amy asked if they had seen her brother; Simmons told her no. Simmons and her sister finished their walk, arriving back home at 8:45 p.m. or 8:50 p.m. Simmons stayed on the front porch for a half hour. At about 9:10 p.m., Simmons again saw Amy, who was headed south on Jefferson Street. About 5 or 10 minutes later, Simmons saw a tan, older model vehicle, which she had seen twice earlier that evening, also headed south on Jefferson Street. Simmons saw the taillight configuration on the tan-colored car for about 30 seconds, and worked with a police artist to produce a sketch. The taillights in

---

[4]Gwen Willis was Esther Schulz's mother; William Willis was Gwen's husband.

the sketch were similar to the taillights on her parents' vehicle, but were not a match with the taillights on defendant's vehicle. Simmons was not sure whether the drawing accurately reflected what she saw that night.

Simmons offered conflicting testimony as to whether defendant's vehicle was the same color as the vehicle she saw on July 1, 1987. She also admitted telling the defense investigator in a May 2002 interview, after being shown photographs of defendant's vehicle, that defendant's car was not the car she saw on July 1, 1987. She noted, at that time, that the taillights were different and that defendant's vehicle had no rust on the right passenger wheel well, unlike the vehicle she saw in 1987. She also told investigators on July 2, 1987, that the driver of the vehicle was on the thin side, a description that would not fit defendant. Defendant's brother, Kenneth, testified that in August 1987, defendant, who was 6 feet 3 inches tall, weighed about 250 or 260 pounds.

Simmons' sister, Cheri Norton, also testified regarding the walk they took the night Amy disappeared. Norton recalled that they saw a vehicle in town that evening that they did not recognize, but she could not provide a description of the vehicle.

Darlene Prior, a Kell resident, testified that on the night of July 1, 1987, she left her sister's home, which was located on Jefferson Street, at about 9 p.m. On her way home, Prior noticed a cream-colored car which resembled a car she used to own–an older Dodge Polaris–going faster than she thought it should. The taillights looked similar to the taillights in the police sketch. Prior did not recall telling officers on July 10, 1987, that the taillights on the car she saw did not look like those in the drawing.

*The Crime Scene*

Richard Caudell, a crime-scene technician with the Illinois State Police, processed the crime scene. Because Caudell died prior to defendant's retrial, Caudell's testimony from defendant's first trial was read to the jury. Caudell testified that the victim was found on a dirt, oil-lease road in Jefferson County about 108 feet west of where the lease road meets county road 1975 east (a north-south dirt and oil road). The victim was lying on her stomach, nude, covered with dust

and dirt, with a large amount of blood around her head. A large open wound on the right side of her neck exposed the spinal cord area. Caudell observed shoe impressions on the victim's back and hairs "stuck in the rectum area."

Caudell also observed a set of tire tracks that began at the entrance to the oil lease road and ended 17 feet from where the body lay, as well as a shoe impression in the mud about six feet from where the tire tracks ended. The shoe impression, which was similar to the shoe impressions on the victim's back, was located on what would be the driver's side. Although he observed no trail of boot prints leading to the body, he observed the same tread design on the ground beside the body. Caudell made plaster casts of the tire tracks and shoe impression, and bagged the victim's clothing which was found on road 1975 east. The underpants had been cut or ripped up the sides, and the red shorts and T-shirt had been turned inside out. The victim's shoes and socks were also recovered.

Donald Ostermeyer, a defense expert in crime-scene techniques and the recovery of evidence, was critical of Caudell. Ostermeyer testified that Caudell should have removed the hairs from the body immediately to prevent loss, and that Caudell compromised the crime scene by placing a sheet over the body. Ostermeyer was also critical of Officer Anthis, the case agent assigned to investigate the matter, because he did not view the crime scene until July 3, 1987. He further testified that police should have talked to oil-field workers about the tire prints.

The State and defendant offered evidence that the distance from Kell to the crime scene was approximately 12 miles. Officer John Kemp testified that the most direct route would take approximately 14 minutes to drive, ending in a desolate area of the county. According to Kemp, unless the driver knew the area, "you would basically wander around through there for an extended period of time before you came back to something you recognized to get you back to a main road." The State offered testimony from Officer Kemp and Russell Hails, a local farmer, which the State argued demonstrated that defendant was familiar with the area. According to their testimony, the last family that lived down the road from where the body was found was the Hufford family. Their home was located about a half mile from the crime scene. Susan Hufford married

defendant's brother Kenneth, and Deborah Hufford married defendant's brother Michael.[5] The Huffords lived at that location until the mid-1980s. According to Joan Sutherland, Susan and Kenneth lived at the Hufford home for a short time. In addition, Officer Kemp testified that defendant previously lived at County Line Road and Harmony Road, about 4½ miles from where the body was found.

*The Autopsy*

Dr. Steven Nuernberger performed an autopsy on July 3, 1987. The autopsy revealed an incised wound to the victim's neck, made by a nonserrated blade, which began left of the midline and had four separate starting marks. The four marks fused into one deep cut that ended behind the right ear, severing the jugular vein and the carotid artery on the right side of the neck and cutting into the cartilage between the fourth and fifth vertebral body in the spinal cord. In addition to the incised wound, Dr. Nuernberger observed hemorrhaging to various neck muscles and the right eye, and that the larynx had been crushed. He observed no ligature marks. Dr. Nuernberger testified that these injuries were consistent with strangulation effected by human hands grasping the victim around the neck.

Three distinct areas of hemorrhaging beneath the scalp indicated that the victim had also sustained three blows to the head. In addition, the inner surface of the upper and lower lips were torn and bruised, suggesting that "[s]he had been smacked across the mouth." The victim's right ear was torn off at the base, and she had numerous abrasions and contusions. Dr. Nuernberger observed a discreet heel print in dirt on the lower back, and a second heel print on the upper right back that was delivered with "a lot of force," injuring the skin. Further examination revealed a subtle abrasion of the labia majus, but no vaginal penetration. Anal penetration, occurring either shortly before or after death, was evident, as was a fracture of the right first rib occurring during the same time frame.

---

[5]At the time of the events at issue here, Michael was married to Tina, who was also a witness in this case.

An examination of the internal organs revealed trauma to the right kidney and that the liver had been torn almost in half, indicating that "a lot of force" had been applied across the abdomen. Based on the small amount of internal bleeding that occurred in connection with the liver injury, Dr. Nuernberger concluded that the injury occurred postmortem.

Dr. Nuernberger testified that based on his examination, the victim was strangled first, possibly into unconsciousness, after which her throat was slit. The pool of blood at the location where the body was found, and the absence of a trail of blood, indicated that the body was not moved after her throat was cut. In addition, exsanguination from the incised wound was more rapid than normal "because someone stepped on her back and squeezed the blood out of her body." Nothing at the crime scene suggested to Dr. Nuernberger that the confrontation between the victim and her attacker was prolonged; the confrontation could have occurred in a "frenzied few minutes." Dirt on the victim's feet indicated that the victim may have been dragged.

Finally, Dr. Nuernberger testified that based on the stomach contents, if the victim last ate at approximately 6:30 p.m., death occurred between three to four hours later, *i.e.*, between 9:30 p.m. and 10:30 p.m.

*Boot and Tire Impression Evidence*

David Brundage, an expert in footwear and tire track identification with the Illinois State Police, examined the plaster casts of the tire and boot impressions from the crime scene. Brundage determined that the boot print was made by a Texas Steer brand boot sold only by K mart stores. Brundage acknowledged that the Texas Steer boots that were among defendant's possessions in Montana had a different lug pattern on the sole and could not have left the prints at the scene. Brundage did not attempt to size the plaster casts of the boot impressions. Dr. Nuernberger, however, testified that the shoe impressions on the victim's back appeared larger than his size 9½ shoe, although the doctor admitted that shoe size was not his area of expertise. The State also offered testimony from William Bodziak, an expert in footwear impressions, that the boot which left the print at

the crime scene was a size 12. Pursuant to directions from Bodziak, Officer Kemp measured defendant's feet using three different methods. Based on Kemp's measurements, Bodziak concluded that defendant's feet are "approximate 12s." Bodziak could not determine the size of the shoe that left the print on the victim's back, but testified that it was larger than a size 7.

Defendant countered this evidence with testimony from Nicholas Petraco, an expert in footwear analysis, that the boot that left the prints at the crime scene was a size 7 or 8. In contrast, defendant's Texas Steer boots were size 12 triple E. According to Petraco, the style of the Texas Steer boot that left the prints at the scene was not available in a triple E width. Marvin Edelman, a senior buyer at Meldisco, the company that manufactured Texas Steer boots, confirmed that the style in question was manufactured in sizes 7 through 13 in medium width only. Edelman noted, however, that if a customer needed a wider width, he or she could simply go up a half size.

In addition to Petraco's testimony, defendant offered the testimony of his brother, Michael Sutherland, and the testimony of Charles Parker, formerly a special agent with the Illinois State Police. Michael recalled that on the night of July 1, 1987, defendant was wearing his black lace-up boots, and Parker testified that none of the boots in the Sutherland household matched the prints at the scene. Tina Sutherland (Michael's wife) also testified that defendant was wearing black lace-up boots that evening.

David Brundage also examined the plaster casts of the tire impressions found at the scene and concluded that the prints were made by a bias-belted tire, rather than a radial tire. Brundage sent a black and white photo of the best plaster cast to over 100 tire manufacturers and distributors for help in identifying the tire that left that print. Plaiston Tire and Laramie Tire suggested, respectively, that the print could have been made by a Dean Polaris or Falls Persuader tire, both manufactured by Cooper Tire. Steve Cramer, the operations manager for consumer relations at Cooper Tire, also believed the print could have been made by a Cooper Tire brand tire and suggested that Brundage obtain a used Falls Persuader tire for comparison. In September 1987, Brundage obtained a used Falls Persuader tire and concluded that the plaster casts from the crime scene were consistent

with the Falls Persuader tire. Brundage also testified that the prints could have been created by a Dean Polaris tire. He explained that the minor differences between a Falls Persuader tire and a Dean Polaris tire that are visible when the tires are new disappear with wear.

Brundage admitted that David Mires, Cooper Tire's chief engineer, offered a different opinion. Mires maintained that the print was not made by a Cooper Tire brand tire but by a Goodyear Custom Super Cushion, possibly mounted on a trailer. Brundage explained that he valued Cramer's opinion over Mires' opinion because Cramer's job at Cooper Tire was to evaluate damaged tires, "so he was used to looking at tires in a worn condition," whereas Mires' job involved the design of new tires.

Mark Thomas, an engineer in the tire mold design group at Cooper Tire, was aware that Mires did not believe the print at the scene was made by a Cooper Tire brand tire, but he did not recall whether he spoke to Mires about the possibility of the print being made by a Goodyear tire. Thomas testified that the print from the scene showed the same number of ribs, grooves, and sipes, and the same repetitive pitch design, as either the Dean Polaris or Falls Persuader tire. He further testified that, based on evidence of "malwear," the tire would have been mounted on the front of the vehicle. According to Thomas, 300,000 Falls Persuader and Dean Polaris tires were produced from 1972 to 1987.

In October 1987, Brundage traveled with investigators to Montana to examine defendant's vehicle, which had a Falls Persuader tire in the right front position. Brundage determined that, with the exception of additional wear, the tire on defendant's vehicle exhibited all the same class characteristics as the plaster cast and that it could have made the impressions at the crime scene. A positive identification was not possible because the individual characteristics were either obliterated or very unclear on the plaster cast.

In November 1987, investigators provided Brundage five additional tires from other vehicles for examination. In a report dated December 4, 1987, Brundage concluded that three of the tires, in addition to the tire from defendant's vehicle, could not be excluded or identified as creating the print at the scene. At trial, however, his conclusion changed. Brundage testified that only one of the tires he examined could have made the print: defendant's tire. Brundage

testified that the day before he took the witness stand, the prosecutor had asked him to reevaluate the tires, which he did, at the prosecutor's office. Brundage explained that the reason for the change in his opinion was that the investigation of the tires he conducted in the prosecutor's office the previous day was "a more thorough investigation" than the one he had conducted in his laboratory in 1987 and that he had a little more knowledge about tires currently than he did 17 years earlier.

The defendant offered testimony from a friend and mechanic, Ronald Lawrence, that sometime after July 24, 1987, but prior to defendant's trip to Montana, he changed all four tires on defendant's vehicle. Lawrence admitted, however, that in a March 1994 affidavit he stated that he changed three tires on defendant's vehicle between July 28 and August 4, 1987. Lawrence also admitted testifying at a prior hearing in 1998 that he had changed 10 tires on defendant's vehicle between the date of the murder and late August. Vicki Lawrence, Ronald's wife, also testified that on July 24, 1987, defendant was at their home for their son's tenth birthday party. Vicki was upset because her husband came home from work and changed the tires on defendant's car, rather than coming inside the house for the party. The first time Vicki went outside they were changing the right front passenger tire; the second time she went outside they were changing "the other tire." Vicki acknowledged that she provided an affidavit in this case in March 1994 that made no mention of this.

In addition to the Lawrences, defendant's mother, Joan Sutherland, testified that she gave a statement to police on October 26, 1987, in which she advised investigators that her son had changed the front tires on his vehicle after Amy's murder and prior to his departure for Montana.

William Anderson, with Gator Tire, testified for the State that he examined the right front tire from defendant's vehicle to determine whether it had been on another vehicle. If the tire had been removed by hand, he would have expected to see marks on the rim, which he did not see.

*Human Hairs Recovered From the Body*

Richard Caudell, the crime-scene technician, observed hairs "stuck in the rectum area" of the victim. Dr. Nuernberger, who performed the autopsy, also observed hairs "adherent to the anal crease and the buttocks *** by fecal matter." Kenneth Knight, a forensic scientist and expert in hair and fiber analysis, examined the hairs recovered from the victim's rectum: eight Caucasian head hairs, which were consistent with Amy's head hairs; two Caucasian pubic hairs, which had been forcefully removed from the source; one Caucasian hair of undetermined body origin; and one animal hair, whose species could not be identified. The pubic hairs were used to screen suspects because of their location on the victim and the fact that the victim was prepubertal and thus had no pubic hair of her own.

In July 1987, Knight conducted microscopic comparisons of the two pubic hairs found on the victim with pubic hair standards from Dennis, Esther, Adam and Ryan Schulz, Gwen and William Willis, and 23 other individuals. In making his comparisons, Knight considered 23 characteristics, including the hair's relative length and color; the hair's configuration, *i.e.*, whether the hair was straight, curly, or wavy; whether the tip of the hair was tapered, broken, rounded, cut or shaved; whether the root was retched, putrid, or bulbous; the size of the shaft; whether the base of the hair was pigmented or damaged; the scale pattern; and the cuticle. Knight explained that to make a determination that an unknown hair could have originated from the same source as a known standard, all the characteristics present in the unknown hair must be present in the standard, with no unexplained differences. When a difference exists that cannot be explained, the source of the known standard must be excluded as a source of the unknown hairs. Based on his microscopic analysis, Knight concluded that the pubic hairs recovered from the victim were dissimilar to the pubic hairs standards from the Schulzes, Willises, and the 23 other individuals and did not originate from them.

Knight also microscopically compared the two pubic hairs with pubic hair standards from defendant and determined that the hairs were consistent with each other. Knight noted a difference in pigmentation in the shaft of defendant's hair, but considered this difference insignificant. Knight concluded that the pubic hairs found on the victim could have originated from defendant. According to

Knight, five other examiners reviewed his work with regard to defendant's hair standards, and all five examiners agreed with his conclusion.

The pubic hairs recovered from the victim and the standards obtained from defendant were also subjected to mtDNA analysis. Harold Deadman, the State's expert on forensic analysis of hair, fiber, and DNA, testified that human hair comparisons based on microscopy are quite difficult because microscopy involves a subjective examination, and the "ability to get the right answer depends on the skill of the person doing the comparison." Deadman further testified that mtDNA analysis is a more objective technique and, when performed after microscopy, functions "as kind of a quality control mechanism," likely to pick up a mistake by the microscopist. Neither method, however, provides absolute identification.

The differences between nuclear DNA and mtDNA were explained by Harold Deadman, as well as John Planz, an expert in the application of DNA and mtDNA techniques in forensic testing, and Terry Melton, whose lab, Mitotyping Technologies, performed the mtDNA analysis in this case. Generally, nuclear DNA is found in the nucleus of a cell and is transmitted by both parents to their offspring. In contrast, mtDNA is housed in the mitochondria of a cell, found in the cytoplasm surrounding the nucleus. No paternal contribution is made to mtDNA; it is inherited only maternally. Thus, a mother, her children, the mother's siblings, and the mother's maternal ancestors all have the same mtDNA.

A nuclear DNA molecule has a "double helix" structure and contains three billion "base pairs" consisting of four chemicals: adenine, thymine, cytosine and guanine. Although mtDNA also exhibits a "double helical" form, it is more compact and contains only about 16,569 base pairs. Scientists conducting DNA analysis of two samples compare the sequencing of the base pairs in certain control regions on the DNA strands. A match between two nuclear DNA profiles is much more discriminating than a match between two mtDNA profiles.

Terry Melton testified that her laboratory performed an mtDNA analysis of the two pubic hairs found on the body, and blood samples obtained from defendant and William Willis, Amy's step-grandfather. Melton explained that the mtDNA is first extracted, then copied and

sequenced, producing a "string of chemical bases 783 long." The sequences from the known sample and unknown sample are then compared. A single difference is inconclusive. Two or more differences means that the donor of the known sample, along with the donor's maternal relatives, are all excluded as the source of the unknown sample. A complete match between the two sequences means that the known individual, and his or her maternal relatives, cannot be excluded as the donor of the unknown sample. If a match is obtained, a search of the "Scientific Working Group on DNA Analysis Methods" (SWGDAM) database reveals how rare or common the sequence may be in the general population, allowing for further statistical analysis. John Planz explained that the SWGDAM database, which the Federal Bureau of Investigation (FBI) maintains and controls, contains over 4,000 mtDNA sequences from primarily North American populations and is constantly growing.

The mtDNA sequencing performed at Melton's laboratory disclosed numerous differences between the mtDNA sequences in the two pubic hairs found on the victim and in Willis' blood. Thus, Willis was excluded as a possible donor of the two pubic hairs. However, a comparison of the mtDNA sequences from the unknown hairs and defendant's blood produced a match.

Melton's laboratory analyzed a third hair of unknown origin removed from the sheet used in transporting the body to the morgue. The mtDNA analysis excluded Willis, the victim, and defendant as the source of the hair. Melton did not find the absence of a match significant. She testified that because humans shed between 75 and 100 hairs per day, it is not uncommon to find hairs at a crime scene that are unrelated to the crime.

Melton's laboratory analyzed a fourth hair, identified as a human hair from the victim's rectal crease. The mtDNA sequence in this hair was identical to the mtDNA sequences in the two pubic hairs recovered from the body, as well as the mtDNA sequence obtained from defendant's blood.

To determine the significance of the match between the mtDNA from the three hairs found on the victim and the mtDNA in defendant's blood, a search was made of the SWGDAM database. Melton testified that this type of sequence had never been observed in the database, indicating a certain rarity in the population. Statistically,

the sequence observed here would not be expected to occur in more than six one-hundredths of one percent (.06%) of the North American population. Stated differently, at least 99.94% of the North American population would not be expected to have this type of mtDNA sequence. Melton further explained:

> "So the vast majority of people will not have this type, and we place that with what we call a 95 percent confidence. So five percent of the time it could be different, but it's not likely to be more than that 95 percent of the time."

Melton also clarified that "we cannot ever eliminate the possibility that a maternal relative [of defendant] was the donor" of the hairs found on the victim. Testimony from various family members established that defendant had numerous maternal relatives, and that defendant, Michael Sutherland, Kenneth Sutherland, and their uncle Walter Sinclair, all lived within eight or nine minutes of each other.

Melton further testified that no measurable pooling of genes exists in any of the regions of the United States that have been sampled, and she has not seen mtDNA sequences that appear to be abundant in one region that are not abundant somewhere else. "[W]e don't have any indication that we would go out into a particular city or town and start seeing one type picked at random over and over again. Not if we have a population to choose from of some size."

William Shields, a defense expert in population and molecular genetics, reviewed Melton's mtDNA reports. Shields testified that Melton's reputation in the scientific community was very good and that the laboratory results Melton obtained were "good clean results." Shields disagreed, however, with Melton's statistical analysis and her use of the SWGDAM database. In his opinion, Melton underestimated the frequency of the mtDNA sequence in this case, thus overstating the significance of the match. Shield's disagreement stemmed from the notion of "population substructure, the fact that the frequency of genetic types will differ among groups of different kinds." To illustrate his point, he offered the following example:

> "Red heads have a reasonably low frequency. If you look at the whole world's population. And, in fact, if I was in *** what used to be called the Belgium [*sic*] Congo, and somebody told me a red head committed a crime, I could

probably find that there were only three or four red heads in the population ***, which would give me a pretty good handle on what was going on. The frequency would be very low ***. But if I went to an Irish village in a particular place in Ireland, where 90 percent of the people are red heads, it would have very little meaning. That's the difficulty."

Shields noted that in this case, there are at least three individuals besides defendant who share the same mtDNA, but that this information is not reflected in the SWGDAM database used by Melton. He testified that a way to insure that the worth of the evidence is not overestimated is to develop an "upper limit," *i.e.*, a frequency that the true frequency is not likely to be greater than. Shields testified that because the population in the geographic area of the crime is not known, the best estimate of the likelihood that someone drawn at random from that population would be a match with the mtDNA from the crime scene is the largest number seen in any populations that are known. The largest such number seen in any population reflected in the SWGDAM database is 1 in 12, reflected in the Thai population. "What it means is we think that if the Thais could have this level of matching, so could a local population that we've not sampled."

Robert Makuch, a defense expert in biostatistics, agreed with Melton's calculations, but disagreed with her conclusion that "we can exclude 99.93% of the population as contributors of the questioned sample." Melton's report, which Makuch reviewed, stated that, based on a database of 4,142 mtDNA sequences, "the 95% confidence limit is 0.000722, or .07%," meaning that "there is a 5% chance that the true frequency in the population exceeds 0.07%." Makuch explained that, multiplying 4,142 by .07 yields a value of 3.

"So what it really is saying within 95 percent confidence, *** it would be reasonable for us to see between zero matches and up to three matches with a data base of this size. *** [B]ut then to turn it on its head and then to say that we can exclude 99.93 percent of the population is in biostatistics, it's simply an inappropriate conclusion for those kinds of data."

Makuch also testified that from a practical standpoint, we know that defendant's siblings have the same mtDNA.

In rebuttal, the State called Bruce Budowle, a senior scientist with the FBI who had a primary role in developing the SWGDAM database. Budowle did not disagree with either Melton's calculations or Makuch's calculations, testifying that the results each obtained are simply expressed differently. Budowle did, however, disagree with Shields' worst case scenario that the mtDNA frequency in this case is one in 12. Budowle also testified that even in small communities, the pooling of a particular mtDNA sequence does not occur to the degree necessary to affect case interpretation.

Additionally, Harold Deadman testified that knowing defendant has brothers would affect only the associative value of the mtDNA evidence, but not the value of the microscopic hair comparisons. Deadman testified that even the hair from identical twins could be microscopically dissimilar. Thus, although Deadman had not seen any reports concerning microscopic examinations of the hair of defendant's siblings and other maternal relatives, he would not expect their hair to be microscopically similar to defendant's hair.

### *Fibers From Victim's Clothing and Defendant's Vehicle*

Kenneth Knight, who examined the human hair recovered from the body, also examined the fiber evidence recovered from the victim's clothing and defendant's vehicle. Knight testified that where two fibers are consistent with each other, *i.e.*, have no significant or meaningful differences, the conclusion is that the fibers "could have originated" from the same source. Harold Deadman testified that a cross-transference, *i.e.*, a two-way transfer of fibers, adds evidential value because the odds of finding these fibers by chance is small, which makes the likelihood that the objects were in contact much greater. According to Deadman, to find any more than a small number of matching fibers by pure coincidence is very unlikely.

Knight testified that among the fibers found on the victim's clothing were three gold fibers and one gold tuft (comprised of over 30 individual fibers) found on the socks; six gold fibers found on the shoes; nine gold fibers found on the underpants; eight gold fibers found on the shorts; and three gold fibers found on the shirt. Knight compared these fibers with carpet standards from the front and back of defendant's vehicle. With the exception of one gold fiber from the

shirt, all of the individual gold fibers and the gold tuft were consistent with the carpeting in defendant's vehicle. Specifically, Knight testified that the fibers were all large-diameter, trilobal, polyester fibers, consistent in color, fluorescence, and refraction. The gold fiber on the victim's shirt that was inconsistent with the carpeting was a medium-diameter gold fiber made of nylon. That fiber was consistent with the fabric in the front and back seats of defendant's vehicle.

Knight was provided carpet standards from the victim's environment, including the Schulz residence, the Willis residence, and Salem Vacuum Cleaners (Dennis Schulz's business), for comparison with the gold fibers found on the victim's clothing. Knight concluded that the gold fibers and the gold tuft did not originate from the victim's environment, as represented by these standards.

In addition, Knight contacted J.P. Stevens & Co., whose name was listed on the carpet tag removed from defendant's vehicle. Robert Woosley, previously with J.P. Stevens and now a consultant for the automotive carpet industry, testified that the gold polyester carpet identified by the carpet tag was manufactured exclusively for Chrysler. According to Gary Mallett, formerly with the Chrysler corporation, the type of carpeting installed in defendant's vehicle was used only in certain models for model years 1977 and 1978. Erring on the high side, Mallett estimated that the same type of carpeting was installed in 80,450 vehicles. Harold Deadman testified that, assuming all the vehicles in which the same gold carpeting was installed still existed in 1987, the odds were one in 1,400 of picking a car at random with the same carpeting.

Kenneth Knight further testified regarding the fibers recovered from defendant's vehicle, which was transported in a rental truck from Montana to Mt. Vernon, Illinois, for processing. Knight testified he did not know how many persons were in the vehicle after July 1, 1987, the date of the murder. Other testimony indicated that a gas station employee drove the car briefly late in the day on July 1, 1987, and that during the period from October 10, 1987 (the date the car was found in Montana), and October 28, 1987 (the date the car was processed), at least two park rangers had been inside the vehicle. In addition, testimony from Officer Anthis, who had flown to Montana and arranged for the transport of the vehicle to Illinois, suggested that

the car could have been driven a short distance when the Jefferson County police conducted their initial investigation of the vehicle.

Knight testified that over 6,000 red fibers were recovered from the vehicle and all but 19 were dissimilar to the victim's clothing. Specifically, 12 cotton fibers and 4 polyester fibers from the front passenger carpeting were consistent with the victim's shirt, which was a red polyester and cotton blend. In addition, one red fiber recovered from the front passenger carpeting, and two red fibers found on the front passenger seat, were consistent with the victim's red shorts. Knight considered this match significant because the victim's shorts were homemade out of a fabric not typically used for clothing: a multilobe, large-diameter polyester fabric. Harold Deadman also considered the red fibers uncommon. The 19 red fibers were inconsistent with carpet standards obtained from the victim's environment, as well as clothing and a bedspread found in defendant's vehicle. Fiber standards from the two park rangers who were inside the vehicle were not provided to Knight for comparison.

Randall Bresee, a defense expert on fiber analysis, criticized Knight's methodology, testifying that Knight's observations were largely subjective. According to Bresee, Knight failed to perform a quantitative analysis of the fibers, such as counting the delusterant particles, measuring fluorescence, and computing the fiber diameter values and modification ratios (a quantitative measure of fiber shape). He also testified that the visual color comparison Knight performed is error-prone, and that the better method would have been to identify the dyes used to color the fibers.

Bresee noted that Hoechst Celanese, the company that produced the polyester used by J.P. Stevens in the manufacture of the carpeting at issue here, could not specifically confirm that it produced the fibers found on the victim's socks. Bresee also opined that any polyester Hoechst Celanese produced that was "off spec," or surplus, would have gone into the marketplace into other goods. Thus, the same fibers found in the carpeting used in 80,000 Chrysler vehicles would also be found in other goods such as residential carpeting, floor mats, and crafts.

*Dog Hair*

Kenneth Knight testified that animals generally have three types of hair: fur, which insulates the animal; guard hairs, which protect the animal; and tactile hairs, such as whiskers. Guard hairs are used for comparison because they have the largest number of characteristics to compare. Knight recovered 32 guard hairs from the victim's clothing: 14 from the socks, 4 from the shoes, 4 from the underpants, 4 from the shorts, and 6 from the shirt. In addition, he obtained a single guard hair from Richard Caudell, which Knight was informed had been removed from the victim's underpants. Knight compared these hairs with hair standards from defendant's dog, Babe, a black Labrador retriever, and concluded that the hairs found on the clothing were consistent with Babe's hair and could have originated from Babe. Knight also compared the dog hairs from the victim's clothing with hair standards from nine dogs in the victim's environment, including five dogs owned by the Schulz family. The hairs found on the victim's clothing were dissimilar to these hair standards. In addition, Knight examined one dog hair recovered from the transport sheet. This hair was also consistent with Babe's hair and dissimilar to the hair standards from the victim's environment.

Knight testified that during the processing of defendant's vehicle he observed animal hair throughout the vehicle and that all of the tapings from defendant's vehicle contained dog hair. Knight sampled 90 hairs from the front right passenger carpeting, which he concluded were consistent with Babe and could have originated from Babe.

Several of the dog hairs found on the victim's clothing, as well as standards from defendant's dog, were provided to Joy Halverson of QuestGen Forensics for mtDNA testing. Halverson testified that the same mtDNA process used on human hair is used on animal hair, but the number of base pairs compared is 655. Like human mtDNA, dog mtDNA does not distinguish among maternal relatives.

Halverson tested eight animal hairs from the victim's clothing and standards from Babe and concluded that the eight hairs were a match with Babe. In order to determine the significance of the match, Halverson compared the mtDNA sequence found in this case with the 345 sequences contained in a dog DNA database she developed. The sequence in this case appeared nine times in her database, indicating a frequency of 2.6%. She explained that dog mtDNA is less

discriminating than human mtDNA and that a "match" in this case means that if the dog population in general were sampled, one out of 38 times the same mtDNA sequence would be seen. Halverson also testified that evidence suggests no correlation between a dog's breed and its mtDNA sequence. Thus, a German Shepherd and a Dachshund could have the same mtDNA and two German Shepherds could have different mtDNA.

Christopher Basten, an expert in statistical analysis of DNA results, reviewed Halverson's report. He testified that the database Halverson used was valid and a reasonable approximation of dogs throughout the United States. According to Basten, an alternative way of expressing the results Halverson obtained is to say that it is "38 times more likely if Babe or a litter mate is the source than if it's some unrelated dog." Basten applied a confidence interval to Halverson's results and obtained a "likelihood ratio of 21, which says that it's at least 21 times more likely if Babe or a litter mate is the source than if it's some random dog. And you could also say it's one in 21."

Robert Makuch, a defense expert on biostatistics, challenged the validity of Halverson's database, testifying that 345 sequences is a small number to be representative of the entire dog population of the United States. He also testified that the method of obtaining the sequences must guard against bias and that a random sampling of dogs from each of the 50 states could produce a database different from the one Halverson compiled.

### Defendant's Knives

Federal park ranger Robert Burns testified that among the items he turned over to Jefferson County police were four knives found at defendant's campsite, including a hunting knife, a "bayonet-type knife," a "survival knife" with a long blade and serrated back edge, and possibly a pocket knife. Officer Kemp also identified certain knives in court as belonging to defendant. Investigators found no blood on these knives or any of the other items from defendant's vehicle and campsite. Dr. Nuernberger testified that any sharp, nonserrated blade or sharp linear object could have been used to cut the victim's throat.

*Defendant's Whereabouts on July 1, 1987*

Evidence established that on July 1, 1987, defendant, who lived in Dix, Illinois, with his parents, went to his regular place of employment in Mt. Vernon, where he worked from 8 a.m. to 4 p.m. Joan Sutherland, defendant's mother, testified that defendant ate dinner with her that evening, and that they usually ate dinner between 5 p.m. and 6 p.m. After dinner, defendant went to the home of his brother Michael.

Tina Sutherland, Michael's wife, testified that on July 1, 1987, defendant was at their home in Texico, Illinois, which is located about five miles and five minutes from defendant's home. Although Tina did not recall when defendant arrived, she recalled that he and Michael watched a violent, bloody movie and that defendant left in his vehicle after the movie ended at 9:30 p.m. Defendant was wearing bib overalls, a white tank "T-shirt," and black boots, which he laced up in her kitchen before he left. Tina admitted that when she spoke to police in November 1987, she told them that defendant left at 8 p.m. or 8:30 p.m., and that she gave testimony to that effect at a hearing in 1989. Tina testified that she did not recall the name of the movie defendant and Michael watched until defendant's present counsel showed her a TV guide for that date. The movie they watched was "Red Sonja," which ended at 9:30 p.m.–15 minutes after Amy disappeared.

Michael Sutherland testified that defendant arrived at their home at 5:30 p.m. or 6 p.m. Defendant was wearing black lace-up boots, which he took off to watch the movie. The movie involved sword fighting. Michael initially told police defendant left around 9 p.m., and testified at the prior hearing that defendant left after the movie. When defense counsel provided Michael a TV guide for July 1, 1987, Michael was able to identify the movie they watched as "Red Sonja," which ended at 9:30 p.m.

In rebuttal, the State called Sherry Witzel, who, in 1989, was an intern for the Jefferson County public defender, assisting defendant's prior counsel. Witzel testified that in May 1989, either Tina Sutherland or Susan Sutherland gave her a copy of the TV guide for July 1, 1987. The same woman later told Witzel that defendant was at her home on the night of July 1, 1987, and that defendant and his brother watched a movie titled "Big Trouble in Little China." Witzel

remembered the name of the movie because she watched the same movie. "Big Trouble in Little China" ended at 9 p.m.

The State also offered evidence that on the night of July 1, 1987, at 10:57 p.m., Joan Sutherland, defendant's mother, received a telephone call from defendant; a belt had broken in defendant's car. Mrs. Sutherland testified that she met defendant at a gas station in Mt. Vernon, approximately 15 miles from her home. She arrived well after 11 p.m. Mrs. Sutherland and defendant made two trips in her pickup truck to an Amoco station on the interstate to get the correct size belt. Defendant installed the belt and Mrs. Sutherland followed him home in her truck. En route, police stopped their vehicles and spoke with them briefly. They then drove home. Defendant was at home the next morning and did not act unusual.

State Trooper Jane Middleton testified that on July 1, 1987, she was requested to assist in the search for Amy Schulz by setting up a point on the Marion-Jefferson county line to stop vehicles to see if anybody had seen Amy. The location was about two-tenths of a mile west of Jefferson Street. Middleton used her flashlight to flag down motorists. At about 12:30 a.m. on July 2, 1987, Middleton tried to flag down defendant's vehicle, but defendant did not stop until Middleton "hollered real loud." He stopped 500 feet east of her. Middleton identified defendant's vehicle from photographs and testified that the driver was heavier set, with brown, unkempt hair, and facial hair. She made an in-court identification of defendant, testifying that she recognized him from his eyes and mouth, although she viewed him primarily from the side. Middleton stated that defendant did not want to look at her and that he appeared nervous. She made a note of the stop in her report of July 7, 1987, but did not identify him by name and could not recall the license plate number. On cross-examination, Middleton testified that what she wrote in her report was simply, "At approximately 12:30 AM on the 2nd I checked the vehicle but could not remember the license plate or the registered owner."

Larry Martin, formerly a cashier at Harper's Gas Station in Mt. Vernon, testified that one evening in early July 1987, prior to July 4, he noticed a bigger man in bib overalls on the lot working underneath the hood of his vehicle, which was an older model. After 10 to 15 minutes, the man used the restroom for a minute or two, came inside and made a telephone call, and then returned to his car. The man

asked Martin to help him move his vehicle to the south side of the building. Martin sat in the driver's seat and steered, while the man pushed. The man waited inside for his ride, and left with an older woman in a pickup truck. When Martin left the station at midnight, the man's vehicle was still on the lot. About 30 minutes had passed from the time Martin noticed the man, to the time the man was picked up. According to Officer Anthis, the most direct route from the crime scene to Harper's Gas Station in Mt. Vernon is about 20 miles and would take about 22 to 24 minutes to drive.

• • •

Before considering the sufficiency of the State's evidence, we note that we have omitted from the foregoing summary any reference to the extensive evidence defendant presented at trial which he argued established that William Willis, the victim's step-grandfather, committed the crimes with which defendant was charged. Defendant has abandoned this argument on appeal, and we therefore find it unnecessary to recount this evidence, particularly the testimony of the numerous witnesses whom, as children, were molested by Willis. Moreover, the jury could have reasonably rejected defendant's theory of the case where the mtDNA evidence excluded Willis as a donor of the two pubic hairs found on the victim's buttocks. Although defendant argued that the hairs were unrelated to the crime, the jury could conclude otherwise based on the sexual assault evidence and Dr. Nuernberger's testimony that the hairs were adhered to the anal crease and buttocks by fecal matter.

As to the sufficiency of the evidence, defendant argues that the State's evidence, contrary to the arguments the State made during closing, failed to connect him to the crime. The State argued in closing that defendant was familiar with the rural road where the body was found and that his whereabouts during the critical period from the time the victim disappeared (approximately 9:15 p.m.) to the time of death (no later than 10:30 p.m.) were unknown. The State also argued that the hair and fiber evidence linking defendant to the crimes could not be simply "coincidence," particularly where carpeting, animals, and numerous individuals in the victim's environment were eliminated as possible sources of the hair and fiber. Finally, the State argued that the tire prints, boot prints, defendant's knives, and the vehicle

-63-

sightings in Kell all had evidentiary value and pointed to defendant. Defendant contends that even if the jury believed all of the State's witnesses and disregarded the evidence defendant presented, the State failed to meet its burden of proof.

We agree with defendant that some of the evidence introduced by the State failed to connect defendant to the abduction, sexual assault, and murder of Amy Schulz. The boot-impression evidence, for example, established at most that defendant's shoe size was the same size as the boot that left the print at the scene and that defendant owned a pair of Texas Steer brand boots different from the style that left the print at the scene. In addition, the knives that were among defendant's possessions when he was arrested in Montana, which the State put before the jury, contained no trace evidence linking defendant to the crimes. Furthermore, evidence suggesting that defendant's vehicle was the tan-colored vehicle seen on the night of July 1, 1987, was marginalized when the State's witness acknowledged that she told defense investigators, after seeing photographs of defendant's vehicle, that his car was not the car she saw on July 1.

Of the remaining evidence, no individual item is compelling. Nonetheless, we cannot say that the remaining evidence, taken together, and viewed in the light most favorable to the prosecution, "is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

The State's tire-impression evidence established that defendant's vehicle, which had a Falls Persuader tire in the right front position, could have left the impressions at the scene. Although the credibility of the State's tire expert, David Brundage, was called into question when he testified inconsistently with his 1987 report, the weight and credibility of his testimony were for the jury to resolve. See *Milka*, 211 Ill. 2d at 178. Any conflict in the evidence stemming from the disagreement between Cooper Tire's Mark Thomas and Steve Cramer on the one hand, and David Mires on the other hand, as to the manufacturer and style of tire that left the print at the scene, and any conflict as to whether defendant changed the tires before leaving for Montana, were likewise for the jury to resolve. See *Milka*, 211 Ill. 2d at 178.

The State's evidence also established that the numerous gold fibers found on the victim's clothing were consistent with and could have come from the gold carpeting and upholstery in defendant's vehicle, and that the gold fibers did not come from the victim's environment, as represented by certain carpet standards. Evidence also established that certain red fibers found in defendant's vehicle, which experts considered uncommon, were consistent with and could have come from the victim's clothing, and that these same red fibers could not have come from the clothing and bedspread found in defendant's vehicle. Although no expert could testify definitively that defendant's vehicle was the source of the gold fibers found on the victim's clothing or that the victim's clothing was the source of the red fibers found in defendant's vehicle, the State's expert, Harold Deadman, considered the association a strong one:

> "Each of the fiber associations that *** were reported in this case have a very small probability of occurring by chance, some more common than others. But each one has a small probability of occurring by chance. The combination of *all of them* occurring by chance is so small that in my opinion the probability that Amy Schulz was not in the Sutherland vehicle shortly before or after she was killed is extremely remote." (Emphasis added.)

The State's microscopic and mtDNA evidence also established that the dog hairs recovered from the victim's clothing could have originated from defendant's Labrador retriever, Babe, but could not have originated from the dogs in the victim's environment. Additionally, the State established that defendant could have been the donor of the two pubic hairs found on the victim's buttocks, as evinced by the microscopic hair comparisons and mtDNA analysis. We acknowledge, as every DNA expert in this case has, that mtDNA evidence cannot exclude defendant's maternal relatives–including his brothers and uncle–as donors of the pubic hairs. We also acknowledge that the State offered no evidence directly excluding defendant's brothers and uncle as suspects. Nonetheless, "speculation that another person might have committed the offense does not necessarily raise a reasonable doubt of the guilt of the accused." *People v. Manning*, 182 Ill. 2d 193, 211 (1998), citing *People v. Herrett*, 137 Ill. 2d 195, 206 (1990).

Defendant notes that the State's own witness Tina Sutherland provided his alibi when she testified that defendant left her home on the night of the murder at 9:30 p.m. when the movie "Red Sonja" ended. The jury learned, however, that Tina Sutherland's testimony that defendant left at 9:30 p.m. conflicted with her testimony at an hearing in 1989 (defendant's first trial) in which she stated that defendant left at 8 p.m. or 8:30 p.m. Furthermore, the evidence was conflicted as to which movie defendant and his brother may have watched that evening. The jury resolved this conflict against defendant.

Defendant also directs our attention to the expert testimony he offered which contradicted the State's forensics findings, as well as evidence he argues demonstrates that police mishandled the investigation. We are cognizant that defendant mounted a vigorous defense, calling numerous expert and lay witnesses to spotlight what defendant regarded as weaknesses in the State's circumstantial case. Our function, however, as a court of review is not to retry the defendant or to substitute our judgment for that of the jury. *Milka*, 211 Ill. 2d at 178; *Evans*, 209 Ill. 2d at 211. The jury heard the evidence; it was "not obligated 'to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt.' " *Evans*, 209 Ill. 2d at 212, quoting *Herrett*, 137 Ill. 2d at 206.

We have reviewed the evidence in the light most favorable to the prosecution, as we must, and hold that the evidence was sufficient, as a matter of law, to support defendant's convictions.


## VI. Caudell Testimony

Richard Caudell, who processed the crime scene and who, with Kenneth Knight, processed defendant's vehicle, testified at defendant's first trial in 1989. Caudell was deposed by defendant's present counsel in October 2001. Caudell died on January 11, 2003, prior to the instant trial. Shortly after Caudell's death, defendant filed a motion to bar Caudell's testimony at the first trial from being introduced at defendant's retrial. The trial court denied the motion, finding, in relevant part, that "Caudell was subject to unlimited cross examination" at the prior trial. Defendant argues that the trial court

erred in denying his motion and requests reversal of his convictions or, in the alternative, a new trial. We review the trial court's ruling for an abuse of discretion. See *People v. Harvey*, 211 Ill. 2d 368, 392 (2004); *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

"It is well settled that the testimony of a witness at a prior hearing is admissible in evidence at trial where the witness is unavailable and when ample opportunity to cross-examine existed at the prior hearing." *People v. Rice*, 166 Ill. 2d 35, 39 (1995). Whether ample opportunity to cross-examine existed must be decided on a case-by-case basis. *Rice*, 166 Ill. 2d at 39. In *Rice* this court considered whether a codefendant's testimony from an earlier suppression hearing which exculpated the defendant was properly denied admission at defendant's trial. We noted that although the State had an opportunity to cross-examine the codefendant at the suppression hearing, the "key question" was "whether that opportunity provided a means to effectively cross-examine codefendant." *Rice*, 166 Ill. 2d at 40. We held that because the focus of the suppression hearing was limited, the State did not have an opportunity to effectively cross-examine the codefendant. Without such opportunity, the codefendant's earlier testimony was properly denied admission at trial. *Rice*, 166 Ill. 2d at 41. We explained:

> "For an opportunity to cross-examine to be considered meaningful, and therefore adequate and effective, the motive and focus of the cross-examination at the time of the initial proceeding must be the same or similar to that which guides the cross-examination during the subsequent proceeding." *Rice*, 166 Ill. 2d at 41.

Here, no question exists that defendant had the opportunity at his first trial to cross-examine Richard Caudell and that the "motive and focus" of that cross-examination is the same as that which would have guided cross-examination at defendant's retrial. Under *Rice*, the trial court did not abuse its discretion by denying defendant's motion to bar Caudell's testimony. See also *People v. Hawkins*, 326 Ill. App. 3d 992, 1003 (2001) (holding that prior testimony of deceased witness

should have been admitted where the "motive and focus of the cross-examination at the time of the initial proceeding are exactly the same as they are today, *i.e.*, the guilt or innocence of [the accused]"); *People v. Taylor*, 287 Ill. App. 3d 800, 810 (1997) (holding that posttrial motion testimony of unavailable witness was properly admitted at defendant's retrial where "[t]he testimony was given at a proceeding that afforded a meaningful opportunity to cross-examine [the unavailable witness] on the issue of guilt or innocence").

Defendant argues, nonetheless, that Caudell's testimony should not have been admitted because prior defense counsel failed to engage in any meaningful cross-examination. Defendant, however, cites no case law holding that prior testimony of a deceased witness will only be admitted where ample opportunity to cross-examine existed *and* such opportunity was fully and effectively utilized. Defendant's reliance on *People v. Duncan*, 173 Ill. App. 3d 554 (1988), for this proposition is misplaced. At issue in *Duncan* was whether the defendant's testimony at his first trial could be used against him at his retrial where defense counsel had labored under a conflict of interest and evidence existed of active collusion between the prosecutor and the defense attorney. The appellate court concluded that defendant's earlier statements "were not made with any degree of particular advice" and could be used for impeachment purposes only at his retrial. *Duncan*, 173 Ill. App. 3d at 558. *Duncan* does not speak to the issue present here.

Even if we entertained defendant's argument that Caudell's testimony could only be admitted if prior counsel conducted a "meaningful" cross-examination, we would find no abuse of discretion by the trial court in admitting Caudell's testimony. In support of his argument that prior counsel failed to conduct a meaningful cross-examination, defendant notes that Caudell's testimony on direct examination covered 86 pages of transcript, whereas Caudell's testimony on cross-examination covered only 10 pages of transcript. Defendant also cites five instances where prior counsel failed to make hearsay objections or to lodge an objection to the prosecutor's leading questions. "[E]ffective advocacy," however, "is not measured by the number of objections raised or the number of pages of cross-examination." *People v. Williams*, 139 Ill. 2d 1, 19 (1990).

The fact that we reversed defendant's convictions based on prior counsel's ineffectiveness "in failing to investigate and present evidence concerning the boots and tire" (*Sutherland*, 194 Ill. 2d at 298) does not, contrary to defendant's current argument, provide a basis for concluding that counsel's cross-examination of Caudell was necessarily deficient. Two specific instances of ineffective assistance do not render prior counsel's conduct throughout the trial deficient. We note, too, that defendant never challenged, either on direct appeal or in his postconviction petition, counsel's cross-examination of Caudell.

Defendant also argues that the State never alleged that Caudell's testimony was necessary to its case. Defendant claims that the State could have called other police officers who were present at the crime scene on July 2, 1987, and that the State used Caudell's testimony as a tactic to prevent effective cross-examination. We disagree. The record indicates that although other officers were present at the crime scene, Caudell alone processed the scene. No other witness could provide testimony comparable to Caudell's testimony concerning his observations about the body, the measurements he took, the evidence he bagged, and the plaster casts he created of the tire and boot impressions. Indeed, defendant criticized the police investigation because even Officer Anthis, the case agent assigned to investigate the murder, did not view the crime scene until July 3, 1987. Under these circumstances, we disagree that the State's use of Caudell's testimony was simply a tactic to prevent cross-examination. The trial court did not abuse its discretion in admitting the prior testimony of Richard Caudell.


## VII. Witzel Testimony

Defendant next argues that the trial court erred in denying his motion to bar the testimony of Sherry Witzel. As previously noted, Witzel, a defense investigator during defendant's first trial, was called by the State to rebut the alibi testimony of Tina Sutherland. Defendant argues that because Witzel was a defense investigator during the first trial, any information Witzel received in connection with the case constitutes work product, protected by the attorney-client privilege, which defendant did not waive. Defendant thus contends that the trial court erred in denying his motion to bar Witzel's testimony, and urges

this court to reverse his convictions or remand for a new trial. We review the trial court's ruling denying defendant's motion for an abuse of discretion. See *Harvey*, 211 Ill. 2d at 392; *Kirchner*, 194 Ill. 2d at 539.

The work-product doctrine on which defendant relies is embodied in Supreme Court Rule 412(j)(i) and provides that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its legal or investigative staffs, or of defense counsel or his staff." 188 Ill. 2d R. 412(j)(i). The work-product rule "protects from discovery the mental processes of an attorney in the preparation of his client's case." *People v. Lego*, 116 Ill. 2d 323, 339 (1987); see also *People v. Knuckles*, 165 Ill. 2d 125, 131 (1995) (Rule 412(j)(i) protects "the attorney's right to the secrecy of the attorney's notes and legal strategies"). This court has held that the verbatim statements of witnesses obtained by a defense investigator do not fall within the scope of the protection afforded by the rule. *Lego*, 116 Ill. 2d at 339. See also *People v. Boclair*, 119 Ill. 2d 368, 375 (1987) (holding that work-product rule was not violated where defendant's investigator's notes were examined *in camera* by the trial court and only the portions of the notes that contained factual statements in the witnesses' own words were turned over to the State).

Defendant acknowledges that if Witzel had prepared a written, verbatim report of Tina Sutherland's statement, such report would not fall within the scope of the work-product rule. Defendant notes, however, that here the State "did not seek any written documents but rather the oral testimony of a defense investigator about her recollection of a conversation which occurred more than 15 years earlier." Defendant urges us to apply the rationale in *People v. Spiezer*, 316 Ill. App. 3d 75 (2000), and hold that Witzel's testimony should have been barred.

In *Spiezer*, the appellate court considered whether the trial court erred in ordering the defendant to disclose to the State a report prepared by the defendant's handwriting expert, whom the defense did not intend to call at trial. The expert analyzed an item that was to be used by the State as evidence at trial. The appellate court noted that neither *Lego* nor *Boclair* addressed whether the work-product

doctrine protects material prepared by defense investigators and/or experts that do not involve the verbatim statements of witnesses. *Spiezer*, 316 Ill. App. 3d at 82-83. The appellate court reviewed case law from other jurisdictions, ultimately following *United States v. Walker*, 910 F. Supp. 861 (N.D.N.Y. 1995). According to the appellate court, *Walker* concluded that "absent the application of the work product doctrine to consulting experts, a defendant's preparation for trial 'can only be crippled by the prospect of creating an unfavorable witness every time he attempts to obtain an unbiased assessment of the government's evidence by consulting an expert.' " *Spiezer*, 316 Ill. App. 3d at 85-86, quoting *Walker*, 910 F. Supp. at 865.

The specific concerns which drove the *Spiezer* opinion are not present here. Witzel's testimony, which disclosed only factual information a witness had relayed to her, is not akin to the report in *Spiezer*, which contained an expert assessment of an item of evidence the State planned to use at trial. Allowing Witzel to testify did not "cripple" defendant's preparation of his case.

Defendant's argument overlooks the substance of the information Witzel's testimony conveyed and focuses simply on the person who acquired the information–a defense investigator. *Lego* and *Boclair* establish, however, that witness statements which do not reveal the impressions or reactions of the investigator to whom they are given are not protected by the work-product doctrine. We appreciate that, unlike the *Lego* case which involved a verbatim witness statement, Witzel's testimony did not provide a verbatim account of Tina Sutherland's statement. Nonetheless, Witzel was able to testify as to the substance of the statement without revealing the "opinions, theories or conclusions" (188 Ill. 2d R. 414(j)(i)) of herself, defense counsel or his other staff.

The trial court in the present case considered the possibility that Witzel's testimony could invade the sphere of protection provided by the work-product doctrine and inquired about the intended scope of Witzel's testimony. The trial court made plain that her testimony would be limited to the TV guide issue and "nothing else." We conclude that the trial court did not abuse its discretion in denying defendant's motion to bar Witzel's testimony.

Defendant also argues that the prosecutor misstated Witzel's testimony in closing argument when he identified Tina Sutherland as the woman who spoke to Witzel about the TV guide. We disagree that the prosecutor misstated the evidence. Although Witzel could not be certain whether it was Tina Sutherland or Susan Sutherland that gave her the TV guide in 1989, Witzel was certain that the woman who gave her the TV guide was the same woman who told her that defendant was at her home on the night of July 1, 1987, watching a movie with her husband, defendant's brother. Based on Tina Sutherland's own testimony, the prosecutor's statement in closing attributing the TV guide conversation to Tina Sutherland was a fair inference.

## VIII. Human mtDNA Evidence

Defendant raises three arguments concerning the human mtDNA evidence the State introduced at trial. Defendant argues first that the trial court erred in denying his motion to take the depositions of four technicians employed by Mitotyping Technologies, the Pennsylvania laboratory that conducted the human mtDNA sequencing. Defendant, however, failed to raise this error in his posttrial motion. Under the forfeiture rules applicable to capital cases, the failure to assert an error in a posttrial motion will be excused in three limited situations: where a timely trial objection was made to the error and it is one which could be raised in a postconviction petition; challenges to the sufficiency of the evidence; and plain errors. *People v. Keene*, 169 Ill. 2d 1, 10 (1995). None of these situations are present here and, therefore, the procedural default applies. Accordingly, we do not reach the merits of this claim. See *Keene*, 169 Ill. 2d at 16-19.

Defendant next argues that the trial court erred in denying his motion to take the deposition of Terry Melton, president of Mitotyping Technologies, who testified at trial about mtDNA sequencing in general, and the results of the sequencing her laboratory did in this case. A claim that the trial court erred in limiting discovery will be reviewed for an abuse of discretion. *People v. Williams*, 209 Ill. 2d 227, 234 (2004).

Supreme Court Rule 416(e) governs discovery depositions in capital cases (188 Ill. 2d R. 416(e)). Pursuant to this rule, discovery

depositions may be taken "with leave of court upon a showing of good cause." 188 Ill. 2d R. 416(e)(i). In deciding whether a deposition may be taken, the trial court "should consider the consequences to the party if the deposition is not allowed, the complexities of the issues involved, the complexity of the testimony of the witness, and the other opportunities available to the party to discover the information sought by deposition." 188 Ill. 2d R. 416(e)(i).

Defendant argued in his motion that because Melton "is going to testify about conclusions she formulated after reading the test results of the *** technicians, it is imperative that the Defense be able to inquire about her rationale and conclusions." In response, the State noted that "[v]irtually everything has been *** documented and *** disclosed about the method of DNA analysis in this case," and that defendant had not satisfied the requirements of Rule 416(e).

The record reveals that prior to defendant filing his motion to take Melton's deposition, the State had already made extensive disclosures to defendant regarding the mtDNA evidence pursuant to Supreme Court Rule 417(b) (188 Ill. 2d R. 417(b)). Rule 417(b) mandates certain disclosures by the proponent of DNA evidence to the adverse party including, but not limited to, copies of the case file, data needed for full evaluation of DNA profiles produced, records reflecting compliance with quality control guidelines, DNA testing protocols, proficiency testing results of the examiners, reports explaining discrepancies in the testing, chain of custody documents, DNA laboratory audits, and numerous other items. 188 Ill. 2d Rs. 417(b)(i) through (b)(xi). The record also reveals that Melton testified at length at a *Frye* hearing related to the mtDNA evidence. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). In denying defendant's motion, the trial court considered the requirements of Rule 416(e) and the "multitude of information" already provided defendant. Under these circumstances, we cannot say that the trial court abused its discretion.

Defendant also argues that the trial court erred in denying his motion to bar certain testimony of Melton. We review the trial court's ruling for an abuse of discretion. See *Harvey*, 211 Ill. 2d at 392; *Kirchner*, 194 Ill. 2d at 539.

Defendant's motion to bar Melton's testimony, filed shortly after the trial began, stemmed from the fact that the State had elected not

to call the laboratory technicians from Mitotyping Technologies to testify at trial. Defendant argued that without the technicians' testimony, Melton's testimony regarding the mtDNA results was improper since she, herself, had not done the "bench work" at the laboratory. We disagree. The testimonial evidence of Melton, who was qualified as an expert in DNA, mtDNA, statistical analysis and genetics, was admissible pursuant to this court's opinion in *Wilson v. Clark*, 84 Ill. 2d 186 (1981). In *Wilson*, we held that an expert may give opinion testimony based on facts not in evidence provided they are of the type reasonably relied upon by experts in the particular field. *Wilson*, 84 Ill. 2d at 193-95 (adopting Federal Rule of Evidence 703). Defendant makes no argument that the facts relied upon by Melton–primarily the raw data produced by the laboratory technicians and the SWGDAM database used to determine the statistical significance of the laboratory's findings–are not the type of facts typically relied upon in the field of mtDNA analysis. We note that the techniques and methods for mtDNA sequencing currently in use were subject to scrutiny at a *Frye* hearing. The trial court ruled that such techniques or methods "are capable of producing reliable results in DNA identification, and are generally accepted in the scientific community." Moreover, defendant's own genetics expert, Williams Shields, testified that the results Melton's laboratory obtained were "good clean results." Based on this record, we cannot say that the trial court abused its discretion in denying defendant's motion to bar Melton's testimony.

Because we have rejected defendant's claims of trial error and because we have held that the evidence is legally sufficient, we affirm defendant's convictions for aggravated kidnaping, aggravated criminal sexual assault, and first degree murder.


IX. Death Penalty

The eligibility phase of defendant's death penalty hearing proceeded before the same jury that determined his guilt. Relying primarily on the evidence adduced at trial, the State argued that defendant was death eligible under three factors: felony murder (aggravated kidnaping); felony murder (aggravated criminal sexual assault); and the victim was under the age of 12 and the death resulted from exceptionally brutal and heinous conduct. See 720 ILCS

5/9–1(b)(6), (b)(7) (West 2004). Before the jury could be instructed, defendant and the State presented to the trial judge an agreed recommended sentence of death. Defendant acknowledged that his decision to proceed in this manner was his own idea and that his counsel advised against it.

The trial judge admonished defendant about the rights he was waiving, including his right to have a jury determine death eligibility and the ultimate sentence, and his right to a second-stage sentencing hearing at which he could offer evidence in mitigation. The trial judge also advised defendant of the possible sentences for murder. Upon questioning by the trial judge, defendant indicated he was not taking any medication and that no one had threatened, forced, or coerced him into agreeing to a recommended sentence of death.

Defendant's counsel indicated his disagreement with defendant's decision, but could offer no reason why the court should not accept the recommendation:

> "[Defendant] feels that this is a good move on his part because we will now take his appeal to the Supreme Court. I indicated to him that if he received a term of years, he could go to the Appellate Court first in Mount Vernon and then he still could ask the Supreme Court of Illinois for redress if he didn't like the decision. He's aware of this.
>
> But like I said, he is a master of his own destiny, and he feels this, for whatever personal and private or public reasons, he feels this is what he has to–what he wants to do.
>
> So I would indicate to the Court as an officer of the Court that I see no reason that he should be precluded from choosing a particular path at this juncture in his life. I do not feel that he is naive, that he has been coerced. I think he's made a rational decision, and I think there is some merit to his decision from a procedural point of view."

Before ruling, the trial judge noted that he had presided over the case continuously since it was remanded for a new trial and had observed defendant in court communicating with his attorneys, participating in the proceedings, and assisting his attorneys in the preparation of his case. The trial judge concluded: "Based upon its personal observation, the Court believes the defendant is fit and fully

understands the nature of these proceedings and fully understands the consequences of his actions." The trial judge then found defendant death eligible under the three factors argued by the State.

Although the State earlier indicated its preference for proceeding with sworn testimony, the trial judge, based on defendant's decision to forgo a hearing in aggravation and mitigation, requested only an offer of proof as to the evidence the State would have presented had such a hearing been held. Among the evidence the State would have presented was evidence concerning the details of defendant's negotiated plea to one count of the attempted murder of a park service employee in Montana; a presentence investigation report disclosing no sexual, physical or emotional abuse of defendant; and testimony from defendant's former stepson that defendant anally sexually assaulted him when he was six years old. The trial judge did not request an offer of proof as to the evidence defendant's counsel would have presented had a hearing in aggravation and mitigation gone forward.

Thereafter, the trial court accepted the recommended sentence of death, finding as follows:

> "The agreed recommended sentence of death has been entered into by the defendant freely and voluntarily and of his own accord. The agreed recommended sentence of death comes within the statutory sentencing guidelines for the offense of first degree murder, that the offer of proof that has been stated herein sets forth factors in aggravation for which the defendant can be sentenced to death, that no mitigating factors to preclude a sentence of death have been presented to the Court. The Court accepts the agreed recommended sentence and hereby sentences the defendant, Cecil Sutherland, to death."

We recognize that the sentencing proceeding in this case was atypical. This fact, however, would not necessarily render the proceeding improper. See *People v. Silagy*, 101 Ill. 2d 147, 178-81 (1984) (rejecting a capital defendant's argument that his waiver of counsel at sentencing "frustrated the statutory intention to provide the sentencing body with all relevant mitigating evidence" or "interfered with society's interest in the fair administration of justice"); accord *People v. McLaurin*, 184 Ill. 2d 58, 95-96 (1998). Notably, defendant

has not requested that this court review the procedures utilized by the trial court at sentencing. In fact, defendant has not raised any sentencing issue before this court and has not directly challenged the trial court's imposition of a sentence of death. Defendant instead mounted only an indirect challenge to his sentence, arguing that the State failed to prove his guilt beyond a reasonable doubt and that his conviction was otherwise flawed. We rejected these arguments and, under the facts of this case, find no basis to consider the matter further. We therefore affirm defendant's death sentence.

As a final matter, we note that the trial judge entered no sentences on the aggravated kidnaping and aggravated criminal sexual assault. We thus remand this case to the trial court for imposition of sentences on these two counts of the indictment.

## CONCLUSION

For the reasons discussed above, we (1) affirm defendant's convictions for first degree murder, aggravated kidnaping, and aggravated criminal sexual assault; (2) affirm defendant's death sentence for first degree murder; and (3) remand the matter to the trial court for imposition of sentences for aggravated kidnaping and aggravated criminal sexual assault.

We also direct the clerk of the court to enter an order setting Tuesday, March 13, 2007, as the date on which the sentence of death, entered by the circuit court of St. Clair County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2004). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed;*
*cause remanded with instructions.*

JUSTICES KARMEIER and BURKE took no part in the consideration or decision of this case.